981 A.2d 835

**STATE of Maryland**

v.

**Terris T. LUCKETT.**

**No. 0340, Sept. Term, 2009.**

Court of Special Appeals of Maryland.

Oct. 5, 2009.

400

Argued by Carrie J. Williams (Douglas Gansler, Atty. Gen., on the brief), Baltimore, for appellant.

Argued by Jennifer L. Saulino (M. Alexia dePottere-Smith, Covington & Burling LLP on the brief), Washington, DC and

(Harry J. Trainor, Jr., Trainor, Billman, Bennett, Milko & McCabe, LLP, on the brief), Annapolis, for appellee.

Panel: MEREDITH, WOODWARD, and CHARLES E. MOYLAN, JR. (Retired, Specially Assigned), JJ.

MOYLAN, J.

In purporting to comply with the mandate of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), police interrogators will do well not to stray too far from the canonical text. Avoidance of error involves more than just steering clear of incorrect statements. *Miranda* contemplates the effective communication of a message to one in the throes of custodial interrogation. The assessment of effective communication involves more than merely scanning for literal error. There are various ways in which communication can be compromised.

## An Interlocutory Appeal

The appellee, Terris Terrell Luckett, was indicted on October 23, 2007, on two counts of first-degree murder along with two counts of using a handgun in the commission of a crime of violence. He filed a pretrial motion to suppress three statements he had made to the police. A hearing on that motion was held before Judge Leo E. Green, Jr., in the Circuit Court for Prince George's County on February 25, February 26, and March 6, 2009, followed by oral argument on April 2, 2009. On April 10, Judge Green filed an order, denying the motion to suppress the first two statements but granting it with respect to a third statement. On April 22, the State filed its interlocutory appeal pursuant to Maryland Code, Courts and Judicial Proceedings Article, § 12–302(c), which provides in pertinent part:

(3)(i) *In a case involving a crime of violence* as defined in § 14–101 of the Criminal Law Article, . . . *the State may appeal from a decision* of a trial court *that excludes evidence* offered by the State. . . .

. . . .

(iii) ... *The appeal shall be heard and the decision rendered within 120 days of the time that the record on appeal is filed in the appellate court. Otherwise, the decision of the trial court shall be final.*

(iv) *Except in a homicide case,* if the State appeals on the basis of this paragraph, and *if on final appeal the decision of the trial court is affirmed, the charges against the defendant shall be dismissed* in the case from which the appeal was taken.

(Emphasis supplied). The record in this case was filed on June 19, 2009. The decision of this Court, therefore, must be rendered no later than October 16, 2009.

## The Factual Background

On August 2, 2007, Tunja Luckett, the appellee's wife, was found dead of a gunshot wound at the couple's Fort Washington home. On that same day, John Scales was shot to death at his barbershop in Clinton. On August 3, charges were filed against the appellee, charging him with both murders. The appellee himself, however, was not yet apprehended. On August 4, Prince George's County Police Officer Stephen Fox responded to the Southern Avenue Metro Station, where the appellee had reportedly leaped backward from the Metro platform directly into the path of an oncoming train. The appellee was pulled from the tracks and rushed by helicopter to the Prince George's County Hospital. Both legs were crushed and, in the course of two operations over the next two days, both of the appellee's legs were amputated. In his meticulously thorough 14–page Opinion of the Court, Judge Green began with a summary that made this bizarre string of events comprehensible.

The state essentially alleges that Mr. Luckett believed that his wife was having an affair with his son's football coach. Mr. Luckett is alleged to have killed his wife and after doing so, gone to the football coach's place of business, a barber shop, and proceeded to kill the football coach on August 2, 2007. On August 4, 2007 having what can best be described as "shooter's remorse", Mr. Luckett attempted to

take his life in two ways. First, he slit his wrists. Failing in that attempt, Mr. Luckett went to a Metro station a little after two in the afternoon and threw himself in front of a moving Metro train.

## The First Statement to Officer Fox

When he first arrived at the hospital, the appellee spontaneously spoke to Officer Fox, who had accompanied him to the hospital from the Metro station. The appellee volunteered to Officer Fox that he had not meant to kill his wife but that he had meant to kill Scales, because he believed that Scales was having an affair with his (the appellee's) wife. The appellee referred to Scales as his "enemy" and said that he had wanted to kill Scales for eight and a half months. The appellee further stated that after he shot Scales, he threw the gun out of the car window. He also stated that after the shootings, he tried to slit his wrists because he did not want to go to jail.

Judge Green ruled that the appellee's statements to Officer Fox were totally spontaneous and were not in response to any interrogation. *Miranda v. Arizona,* therefore, did not apply. *Smith v. State,* 186 Md.App. 498, 520–22, 974 A.2d 991 (2009). The judge ruled:

There is no evidence that either officer interrogated or came close to interrogating Mr. Luckett in any way. These statements were volunteered by Mr. Luckett. "Volunteered statements of any kind are not barred by the Fifth Amendment". *Miranda v. Arizona,* 384 U.S. 436, 478, 86 S.Ct. 1602, 16 L.Ed.2d 694.

The correctness of that ruling is not before us on this appeal.

## The Second Series of Statements to Detective Selway

On the next day, August 5, Detective Brian Selway, of the Homicide Division, took over the duty of being posted as guard at the appellee's hospital room. He came on duty at 7 A.M. The appellee awoke between 10:15 and 10:20 A.M. and immediately started talking. Judge Green's Opinion of Court

again well summarized Detective Selway's initial concern and his observations with respect thereto.

Det. Selway was concerned with Mr. Luckett's level of alertness and asked him questions such as who the President of the United States was and what the Detective's first name was. Answering correctly, Det. Selway observed Mr. Luckett to be alert and responsive. Mr. Luckett also answered questions of hospital personnel and was aware of his surroundings. Selway watched as Mr. Luckett joked with the hospital staff when they came into the room to monitor his medicines. Through the conversation Mr. Luckett revealed that he was aware an arrest warrant had been issued for him.

At 10:33 A.M. Detective Selway read the appellee his *Miranda* warnings from the small business card he carried in his wallet. If a later effort to inform the appellee of his *Miranda* rights on August 13, which we will be examining in some depth, is a textbook example of **what not to do,** the unadulterated *Miranda* warnings that Detective Selway delivered on August 5 are a textbook example of **what to do,** to wit, of saying what needs to be said in simple and straightforward language.

You have the right to remain silent. Anything you say can and will be used against you in a court of law. You have the right to talk to a lawyer and to have him with you during questioning. If you cannot afford a lawyer, one will be appointed for you before a statement is taken, if you wish. If you decide to give a statement, you still have the right to stop at any time so you may talk to a lawyer.

The appellee waived those rights by saying, "I understand." From then until 2:20 P.M., Detective Selway simply listened as the appellee talked. The appellee reaffirmed that he believed that his wife had been having an affair with their son's football coach. He repeated his earlier statements to Officer Fox that he did not mean to kill his wife and that he threw the gun away after shooting Scales at the barbershop. He also told Detective Selway that he kept a journal under the

mattress in his bedroom, and he asked Detective Selway to retrieve it. At approximately 2:15 P.M. a District Court Commissioner arrived at the appellee's intensive care room. The appellee, in Detective Selway's presence, told the Commissioner, "I know what I did was wrong." The appellee then asked, "Is there any way I can get off the death penalty?" The Commissioner responded that she could not give legal advice.

Judge Green's primary concern with respect to those statements was whether the appellee was in a sufficiently lucid state 1) to make a free and voluntary confession and 2) to make a free and voluntary waiver of his *Miranda* rights. Judge Green found that the appellee was lucid and rational and ruled that the motion to suppress those statements would, therefore, be denied.

> [T]he Court finds Detective Selway to be believable and places great weight on his testimony. Although Det. Selway was initially concerned about Mr. Luckett's state of mind, he concluded [that] Mr. Luckett was lucid after asking him non-interrogational questions.
>
> The Court finds that Mr. Luckett understood what he was saying and was not improperly coerced by Detective Selway into giving these statements. *The Court concludes that the statements made to Detective Selway and the statement made in the presence of the Commissioner, Detective Selway and Detective Codero was made freely and voluntarily.*

(Emphasis supplied).

The correctness of that ruling is also not before us on this appeal.

### The Third Statement to Detective Barba

This appeal by the State is taken only from Judge Green's decision to suppress a third statement, given by the appellee to Detective Matthew Barba on August 13, 2007. Detective Barba briefly visited the appellee in his hospital room on August 8, identified himself as the lead investigator in the two homicides with which the appellee was charged, dropped off a

business card, and said that he would be back on another day. Detective Barba returned on August 13 with audio/video equipment and a technician with the hope of conducting a videotaped interview with the appellee.

Detective Barba arrived at 12:35 P.M. The recording equipment was set up and ready to go by 12:52 P.M. During the 17 minutes of preparation time, Detective Barba and the appellee were engaged in conversation that was not recorded. Once the tape was running, Detective Barba launched into an extended discussion with the appellee about his *Miranda* rights. At the end of the discussion, the appellee ostensibly waived those rights and agreed to talk. He then gave a lengthy statement detailing his belief that his wife was having an affair with Scales, his activities during the weeks leading up to the murders, and the murders themselves. He repeated his earlier statements that he had not meant to kill his wife but that he had made a conscious decision to kill Scales. He repeated that he knew that what he did was wrong and that he was willing to "accept my punishment and be accountable for my actions." He expressed the hope that Detective Barba would not "throw the book at me."

### The Suppression

In suppressing the third statement, Judge Green ruled that there were, in the course of the advisements, several statements that were affirmatively incorrect. One was a statement about not needing a lawyer.

*Detective Barba's statement "you don't need a lawyer" is not a correct recitation of the law and should never be spoken by any law enforcement officer to a person in custody under any circumstances.* These words were related to Mr. Luckett two times in the videotape and according to Detective Barba, stated at least two other times. It appears from Detective Barba's statement that he may have stated the same words before the tape was turned on as well. *Any statement that could possibly lead the defendant*

*to misconstrue his rights under Miranda is contrary to the law requiring knowing and voluntary waiver.*

(Emphasis supplied).

### The Totality of the Advisements

■ We affirm the decision of Judge Green to suppress the videotaped confession of August 13. In making our own independent constitutional decision, *Nathan v. State,* 370 Md. 648, 659, 805 A.2d 1086 (2002), we rely not simply on the incorrect statements pointed out by Judge Green. We hold that, under the totality of the circumstances, the unnecessarily lengthy and rambling discussion about the nature of the *Miranda* rights not only included specifically questionable statements of the law but utterly failed effectively to communicate the message mandated by *Miranda.* Because this communicative failure inhered in the totality of the message, it behooves us to set out that advisory message in its totality.

DETECTIVE BARBA: Like, *like I said,* I'm not here, *I'm here to help.*

MR. LUCKETT: Whatever you need.

DETECTIVE BARBA: Okay. I'm going to explain everything to you, um, I'm Detective Barba okay, I introduced myself last week. I'm Detective Barba of the Prince George's County Police Department, okay.

MR. LUCKETT: Yes.

DETECTIVE BARBA: I'm going to read you your rights for this particular interview—

MR. LUCKETT: Okay.

DETECTIVE BARBA:—that we're going to have, okay.

MR. LUCKETT: Yes.

DETECTIVE BARBA: You do have rights. I'll also explain that we have audio and video on right now, you do understand that?

MR. LUCKETT: Yes.

DETECTIVE BARBA: Right? Okay. Now I'll read everything just like were, just call like *Miranda* rights. Okay.

MR. LUCKETT: Okay.

DETECTIVE BARBA: If you don't understand anything that I'm saying to you, stop me.

MR. LUCKETT: Okay.

DETECTIVE BARBA: Okay, I have no problem with that all right. Now I'm going to read everything verbatim, okay.

MR. LUCKETT: Yes.

DETECTIVE BARBA: And we'll go from here. All right, this is an advice of rights and waivers form, right here okay.

MR. LUCKETT:—

DETECTIVE BARBA: I'm going to show it to you afterward. You want to move your thing up a little bit?

MR. LUCKETT: Yeah, let me see that.

DETECTIVE BARBA: Okay. This is—rights and waivers form.

MR. LUCKETT: I understand.

DETECTIVE BARBA: For our Prince George's County Police Department. Today's date is August 13, 2007 and the time is 12:52, okay. Um, I am now going to read you your rights under the law. If you do not understand something that I say to you, please stop me and I'll explain them to you, okay?

MR. LUCKETT: Yes.

DETECTIVE BARBA: You have the right to remain silent, if you choose to give up this right, anything that you say can be used against you in court.

MR. LUCKETT: Yes

DETECTIVE BARBA: Okay. *You have the right to talk to a lawyer before you are asked any questions to have a lawyer present with you while you're being questioned, that's about this case specifically.*

MR. LUCKETT: Okay.

DETECTIVE BARBA: *Like I said, if we want to talk about the Redskins, you don't need a lawyer for that because it does not concern—okay.* Uh, if you want a lawyer and cannot afford, uh, a lawyer will be provided with you at no cost, in a public defender, things—or you can get a private attorney. If you want to answer questions now without a lawyer, you still have the right to stop answering questions at any given time.

MR. LUCKETT: Okay.

DETECTIVE BARBA: Now, you understand that? Do you understand these rights?

MR. LUCKETT: Yes.

DETECTIVE BARBA: Okay—that's you understand just check yes and then initial if you understand those rights.

MR. LUCKETT: Just check yes?

DETECTIVE BARBA: If you understand the rights that I'm giving you.

MR. LUCKETT: Yeah.

DETECTIVE BARBA: And then initial. Okay. Have you been, uh, *do you want to make a statement at this time* without a lawyer present? And *that could be the verbal one. We're not* [background noise] *written, normally I would take a written one, part of it will be a verbal that would be us discussing the incident back and forth, do you want to do that*

MR. LUCKETT: *I'm sorry, if I say yes, we're going to discuss the incident right?*

DETECTIVE BARBA: *Mm-hmm.*

MR. LUCKETT: *Would I be setting myself up?*

MALE VOICE: *Huh?*

MR. LUCKETT: *Would I set, would I be setting myself up?*

MALE VOICE: You—

MR. LUCKETT: *I mean I'm, I'm looking toward you for answer you know what I'm saying?*

MALE VOICE: DETECTIVE BARBA:

MR. LUCKETT: Now which is—would he be asking you.

DETECTIVE BARBA:—

MR. LUCKETT:—we're, we're going to discuss the case—

DETECTIVE BARBA: You—

MR. LUCKETT:—*without my lawyer?*

DETECTIVE BARBA: *Okay, if we discuss any matters outside of the case, you don't need a lawyer present at all. Period. Okay?*

MR. LUCKETT: So—

DETECTIVE BARBA: *We can talk about anything but the case—*

MR. LUCKETT: *So I won't be hurting myself?*

DETECTIVE BARBA: *If we talk about anything but the case, okay.*

MR. LUCKETT: *Mm—hmn*

DETECTIVE BARBA: I'm just letting you know that you do have rights okay.

MR. LUCKETT: Okay.

DETECTIVE BARBA: *When we are discussing matters of the case, when I ask you something specifically—*

MR. LUCKETT: *Mm—hmm.*

DETECTIVE BARBA:—*or if you tell me something specifically, you have a right to have a lawyer present here, okay?*

MR. LUCKETT: Okay.

DETECTIVE BARBA: *What you're doing here is that you are giving up a right to having lawyer present to tell me your side, okay.*

MR. LUCKETT: Okay.

DETECTIVE BARBA: *You don't have to do that, Okay.*

MR. LUCKETT: Right.

DETECTIVE BARBA: *But for me to be able to present your side—*

MR. LUCKETT: Okay.

DETECTIVE BARBA:—*along with everything else that I'll be presenting—*

MR. LUCKETT: *Mm—hmm.*

DETECTIVE BARBA: *Okay, then that goes on my integrity.*

MR. LUCKETT: All right, I know what you're saying.

DETECTIVE BARBA: I'm going to give the full version of what's going on.

MR. LUCKETT: Okay.

DETECTIVE BARBA: Okay. Do you understand that?

MR. LUCKETT: Correct.

DETECTIVE BARBA: Okay. So you understand that you do have rights.

MR. LUCKETT: Right.

DETECTIVE BARBA: You don't have to talk to me.

MR. LUCKETT: Correct.

DETECTIVE BARBA: Okay. Do you want to make a statement at this time without a lawyer present?

MR. LUCKETT: Yes.

(Emphasis supplied).

### The Irrelevance of the Washington Redskins

■ How was the *Miranda* message compromised? Let us count the ways. Communicative effectiveness cannot be assessed in a vacuum. It may only be evaluated in terms of what particular message is intended to be communicated to what particular audience and for what purpose. Let us put on a microscopic slide for a moment the snippet about the Washington Redskins.

DETECTIVE BARBA: You have *the right* to talk to a lawyer before you are asked any questions, *to have a lawyer present with you while you're being questioned, that's about this case specifically.*

MR. LUCKETT: Okay.

DETECTIVE BARBA: *Like I said,*[1] *if we want to talk about the Redskins, you don't need a lawyer for that because it does not concern*—okay.

(Emphasis supplied).

Deferring for the moment the possible impact on a defense of Not Criminally Responsible, Detective Barba's observation about the constitutional implications of conversation concerning the Redskins may have been technically impeccable. At an academic seminar for judges and lawyers, exploring the outer limits of the *Miranda*-based prophylactic right to counsel, it might serve as a good teaching example. The appellee Terris Luckett, however, does not attend such seminars. The nuance was something he did not need to know. Effective communication to one audience for one purpose may be totally ineffective to another audience for another purpose. For the

---

**1.** The "Like I said" lead-in gives rise to an inference that in the antecedent 17 minutes the two had already discussed conversation about the Redskins as a type of event that would not involve a right to counsel.

appellee, lying in a hospital bed accused of two first-degree murders, what he needed to be told was that he was entitled to a lawyer in that particular place at that particular time. He did not need to be told of purposes for which he did not need a lawyer. The homicide detective was not in the appellee's hospital room with videotaping equipment to discuss the Washington Redskins. The lengthy statement that was then videotaped made no mention of the Washington Redskins. Why then, we ask, were the Redskins mentioned? The extraneous reference did not in any way enhance the vital constitutional message the appellee was entitled to receive. The extraneous material, even if not literally incorrect, got in the way of the message.

### The Possible Relevance of the Washington Redskins

In this case, however, conversation about the Washington Redskins might have taken on critical relevance. The killings were crimes of extreme passion. There is a strong suggestion that the appellee's belief in his wife's adultery may have been a long-harbored delusion. The police team, certainly Officer Fox and Detective Selway, was well aware of the appellee's two suicide attempts, the second resulting in the amputation of both legs. Detective Barba himself, moreover, was the lead investigator in the case and was personally familiar with the case file. He had read over on several occasions the appellee's journal in which the appellee had expressed his fears and suspicions about his wife's infidelity. Detective Barba was also aware of the fact that on the day before the shootings the police had been called to the appellee's home for a domestic dispute and that the appellee's wife had sought information about how to apply for an emergency psychological evaluation of her husband. Looming large on the adjudicative horizon generally and on Detective Barba's radar screen specifically, therefore, was the likely defense of Not Criminally Responsible.

We now pose a hypothetical scenario. Let us suppose that the appellee had responded to Detective Barba, "I am not willing to discuss this case in any way without the presence of

a lawyer. I am, however, perfectly willing to talk about the Redskins." Let us further suppose that the two then discussed football for the next fifteen minutes, after which Detective Barba packed up his videotaping equipment and bade the appellee farewell. Suppose further that in the course of the fifteen minute discussion of football, the appellee delivered an incisive and insightful analysis of the Redskins' fortunes that would have done credit to John Madden or Al Michael. If the appellee were later to proffer a plea of Not Criminally Responsible, is it conceivable that that tape would not be offered by the State to demonstrate to a jury how lucid and logical the appellee could be when he chose to be? Judge Green commented on the broad potential of anything the appellee might say on any subject to compromise his defense.

By the ninth day of investigating this matter, *Detective Barba*, a seasoned Prince George's County Officer, *either knew or should have known that the defense would allege that Mr. Luckett was not criminally responsible for his actions*, or that his sanity would be questioned. *Any statement shedding light on his mental capacity* or understanding, *regardless of whether it was about this case or not, could be relevant* and Mr. Luckett would have greatly benefited from a counsel. *Mr. Luckett's entire life was more or less in question at this time.* This was not simply a "domestic" case as the State believes. Much more was riding on the questioning of Mr. Luckett at this stage of the investigation of "the case."

(Emphasis supplied).

An attorney would immediately have recognized the possibility of an NCR plea and would have advised the appellee not to talk about anything. The advice to the appellee, therefore, that he did not need a lawyer to talk about the Redskins was not only extraneous but it was, in the circumstances of this case, affirmatively wrong.

### "I'm Here To Help"

There is an ironic incongruity about a homicide investigator's presenting himself as the friend of the suspected

homicidal agent. The videotaped portion of the *Miranda* advisements, however, begins on just such a note of supportive amiability.

DETECTIVE BARBA: Like, *like I said.* I'm not here, *I'm here to help.* (Emphasis supplied). There is the strong inference, moreover, that that theme about Detective Barba's being there to help the appellee had already been fully developed during the antecedent 17 minutes before the videotaping began. What was said on tape was "like I said" before the taping began.

When someone such as the appellee is being asked to decide whether he wants a lawyer to help him, such language about the interrogator's being there to help him can be misleading. A suspect might easily believe that he must give up one source of help in order to obtain another source of help. That could be a difficult Solomon's choice for a defendant to make. In truth, of course, the detective is not there to help. A trained homicide investigator goes into an interrogation room with the intention of getting a confession of guilt. His job is to develop the evidence that will produce a conviction. Sympathy and understanding are simply among the weapons in the arsenal of a skilled interrogator. If they are helpful in persuading a defendant to forego the assistance of counsel, they will have been particularly effective.

There is an echo here of the fictional Sergeant Andy Sipowitz of *N.Y.P.D. Blue* as he poses the delicate balance between two mutually exclusive sources of help, "You're entitled to a lawyer, of course, but once you ask for a lawyer, I won't be able to help you out anymore." That type of statement can only be read as a discouragement of invoking one's right to counsel. It is an express disincentive as it cautions that obtaining a lawyer will come at the cost of the interrogator's no longer being able to help the defendant out by "telling his side of the story." Just such a disincentive was articulated in this case as Detective Barba pointed out to the appellee the advantage of having himself (Barba) available "to tell your

side" of the case, a guarantee buttressed by Detective Barba's personal "integrity." The choice was posed as a *quid pro quo.*

DETECTIVE BARBA: What you're doing here is that *you are giving up a right to have [a] lawyer present [in order for me] to tell me your side, okay.*

MR. LUCKETT: Okay.

DETECTIVE BARBA: You don't have to do that, Okay.

MR. LUCKETT: Right.

DETECTIVE BARBA: *But for me to be able to present your side—*

MR. LUCKETT: Okay.

DETECTIVE BARBA:—*along with everything else that I'll be presenting—*

MR. LUCKETT: Mm—hmm.

DETECTIVE BARBA: *Okay, then that goes on my integrity.*

MR. LUCKETT: All right, I know what you're saying.

DETECTIVE BARBA: *I'm going to give the full version of what's going on.*

(Emphasis supplied).

The inevitably seductive effect of repeated assurances that the interrogator is there "to help" the defendant is that the officer is presented as an alternative source of "help." Such a choice is an unspoken inducement to waive the right to counsel. A helpful and reassuring friend in the hand may appear to be worth two in the bush. It was almost immediately after that exchange that the appellee gave "up a right to having [a] lawyer present" and agreed to give Detective Barba a confession.

One has to wonder, in passing, how it "helps" a defendant to confess to murder, even if the confession also includes a tinge of explanation or extenuation. On balance in such a mixed confession, the State's "side of the story" packs a lot more punch than the defendant's "side of the story." If a defendant

never confessed to a criminal homicide in the first place, he would have no need to mitigate an unproved murder down to manslaughter. How the confession in this case would possibly "help" the appellee remains a mystery that only police interrogators may be able to fathom. If the appellee's version of the crimes could be helpful to his cause, he is completely free, of course, to take the stand himself and to tell "his side of the story." He does not need a police detective to do that for him. To the extent to which the appellee's "side of the story" might be self-servingly exculpatory, moreover, it would, from the mouth of the detective, be inadmissible hearsay. The "help" simply does not promise to be very helpful. An attorney, of course, would have been able to alert the appellee to all of this, but the attorney was bargained away in exchange for the ostensible "help."

## A Possibly Improper Inducement

■ Another possibly disturbing aspect of Detective Barba's "helping" of the appellee lurks in the 17 minutes of untranscribed conversation before the videotaping commenced.[2] Detective Barba's testimony established that at the very outset of the untranscribed conversation, the appellee stated to him, "You have got to get those tapes." These were security tapes from a hotel that the appellee believed would help prove his case about the adulterous relationship between his wife and Scales. Detective Barba's response to the appellee may well have given the impression that he would make an effort to obtain the tapes but only after the appellee had signed a waiver of his *Miranda* rights. As the State itself described that exchange in its brief, "Detective Barba responded that they could discuss the case, but that first he needed to inform Luckett that 'he had rights' that would have to be waived." That could be read as conditioning help with the surveillance tapes on a waiver of the *Miranda* rights. In

---

2. An 18 minute gap in a tape recording helped to bring down a president in 1974.

the cross-examination of Detective Barba on February 26, 2009, the following exchange took place.

Q. But you did talk to him about the tapes. Just tapes. You may not have known what they were about, but *you knew he wanted tapes before the video started.*

A. *When we came in, we immediately discussed that. I said before we get into anything else* you have rights I have to explain to you. If you want to talk about the case or anything related to it, *you have rights you have to waive them, things of that nature. I did not want to hear any of his utterance* or anything related to it *until he was waived.*

Q. *But you told him you would help; right?*

A. *I help everybody.* Regardless of whether they are a defendant or victim or a witness. It's the whole case I'm looking into. I present the best case possible. I'm not going to go there with just a one sided case.

Q. But he started talking about the tapes and you said you were there to help; right?

(Emphasis supplied).

Following an objection and a lengthy bench conference that wandered all over the lot, that final question on cross-examination was never ultimately answered. Detective Barba, of course, did not need for the appellee to waive his *Miranda* rights in order for the detective to investigate the existence of possibly exculpatory or extenuating surveillance tapes. That investigative responsibility has nothing to do with whether a defendant's *Miranda* rights have or have not been waived. If the appellee was led to believe otherwise, that would clearly have been an improper inducement to waive those rights. The burden, of course, is on the State to persuade us that such an inference was not suggested.

### A Stingy Interpretation of the Right to Counsel

In going beyond the text of the routinely prescribed *Miranda* catechism, such as that given to the appellee by Detective Selway on August 5, Detective Barba paid the right to counsel the lip service he deemed to be minimally and literally

required. On every occasion (three) that he mentioned the right, however, he downplayed its significance. That downplaying is unquestionably a part of the total communicative phenomenon that we evaluate. In subtle (perhaps not so subtle) ways, he eroded and undermined the value of the right by narrowing it and constricting its applicability. Like a standing epithet in classical literature, every mention of the right to counsel was appended by the qualifying notion of "when we're discussing this case specifically."

The first such mention of the right to counsel came along with the reference to the Redskins.

> DETECTIVE BARBA: Okay. *You have the right* to talk to a lawyer before you are asked any questions *to have a lawyer present with you while you're being questioned, that's about this case specifically.*

> MR. LUCKETT: Okay.

> DETECTIVE BARBA: Like I said, *if we want to talk about the Redskins, you don't need a lawyer* for that because it does not concern—okay.

(Emphasis supplied).

The second reference to the right to counsel, moreover, laid stress on the situations in which the right did not exist. That is a counterproductive way to explain the value of the right. It stresses what the right is not instead of what the right is. Ironically, the appellee was asking Detective Barba whether he (the appellee) was being asked "to discuss the case ... without any lawyer." Detective Barba never answered that question but talked, instead, about the lack of any such right "if we talk about anything but the case." That was a verbal "shell game" in which the tongue was faster than the ear.

> MR. LUCKETT:—[W]e're, *we're going to discuss the case—*

> DETECTIVE BARBA: You—

> MR. LUCKETT:—*without my lawyer[?]*

DETECTIVE BARBA: *Okay, if we discuss any matters outside of the case, you don't need a lawyer present at all period, okay.*

MR. LUCKETT: So—

DETECTIVE BARBA: *We can talk about anything but the case—*

MR. LUCKETT: *So I won't be hurting myself* [?]

DETECTIVE BARBA: *If we talk about anything but the case, okay.*

MR. LUCKETT: Mm—hmn

(Emphasis supplied).

The final reference to the right to counsel expressly limited the applicability of the right to "when I ask you something specifically" or "when you tell me something specifically."

DETECTIVE BARBA: When we are discussing matters of the case, *when I ask you something specifically—*

MR. LUCKETT: 'Mm—hmm.

DETECTIVE BARBA:—*or if you tell me something specifically, you have a right to have a lawyer present* here, okay?

(Emphasis supplied).

To say that the appellee's right to counsel was restricted to discussion of that specific case, of course, was flatly wrong. With respect to the *Miranda*-based right to counsel, *Arizona v. Roberson,* 486 U.S. 675, 108 S.Ct. 2093, 100 L.Ed.2d 704 (1988), unequivocally established that the right applies not just to the case that prompted the *Miranda* warnings but that it extends to all other even totally unrelated cases that may be discussed while the custody remains unbroken.

■ Even in the context of the specific case, moreover, the *Miranda*-based right to counsel clearly is intended to protect defendants against making peripherally damaging admissions as well as against making directly incriminating confessions. One would like to ask Detective Barba, "Is there no right to

counsel if we talk about the case generally instead of specifically? What, incidentally, is the difference?" Clearly the appellee had a right to counsel if he were going to be asked about whether his wife had a life insurance policy?, Whether he was the named beneficiary of that policy?, Whether he owned a gun?, Whether and when he purchased ammunition?, Whether he and his wife had any history of domestic problems? To an unschooled layman, such inquiries might be deemed to be "not about this case specifically," but they would be dangerous territory in which to venture. It is to negotiate just such treacherous labyrinths that the guiding hand of counsel is desperately needed. An untutored defendant is simply incompetent to weave and dodge between the incriminating and the extraneous, as if he were Lisa leaping from ice floe to ice floe in her wild flight across the Ohio River.[3]

■ Detective Barba's restrictive qualifying of the right to counsel made the advice wrong as a matter of law. As the Supreme Court stated in *Arizona v. Roberson*, 486 U.S. at 684, 108 S.Ct. 2093, "[A] suspect's request for counsel should apply to any questions the police wish to pose." *A fortiori*, the possible effect of anything the appellee might have said on an NCR plea, which we have already fully discussed in a related context, made the restriction of the right exponentially wrong. As was observed by Wayne R. LaFave, 2 *Criminal Procedure* (3d ed.2000), § 6.9(c), "[T]here is an absolute prohibition upon any trickery which misleads the suspect as to *the . . . dimensions of any of the applicable rights.*" (Emphasis supplied).

### "Only a Verbal Discussion Back and Forth"

In terms of possibly downplaying the significance of the interview that was about to take place, Detective Barba went out of his way to explain to the appellee that any statement that he might "want to make . . . without a lawyer present" would only be a "verbal one" and not a "written one." It

---

**3.** Harriet Beecher Stowe, *Uncle Tom's Cabin.*

would just "be us discussing the incident back and forth, do you want to do that?" As we read this particular exchange, and it is we who must evaluate the total communicative effort, there seems to be a subtle implication that a mere verbal discussion "back and forth" will not be as ultimately and definitively damning as would be a written and signed statement. It is somehow more innocuous.

> DETECTIVE BARBA: ... [D]o you want to make *a statement at this time without a lawyer present?* And *that could be the verbal one.* We're not [background noise] written, *normally I would take a written one,* part of it will be *a verbal that would be us discussing the incident back and forth,* do you want to do that.

(Emphasis supplied). Again we have to ask, "What was the purpose of making that distinction and what was its effect?"

■ That gratuitous comment was a small thing that, by itself, would probably not give rise to further notice. As the appellee was being asked to waive his prophylactic safeguards against self-incrimination, however, there is the unmistakable sense that Detective Barba was again downplaying the gravity of the interview that was to follow such a waiver. A confession, however, is a confession, whether verbal or written or memorialized on videotape, and no intimation should be given to the contrary.

In *Logan v. State,* 164 Md.App. 1, 882 A.2d 330 (2005), *aff'd in part,* 394 Md. 378, 906 A.2d 374 (2006), this Court held that an ostensible *Miranda* waiver was invalid for a number of reasons. Although several misstatements made by the interrogating detective in that case were more blatant than those in this case, there were also several common denominator factors between that case and this. As Judge Hollander pointed out, 164 Md.App. at 47, 882 A.2d 330:

> *We cannot ignore that,* before the formal advisement that culminated in appellant's waiver, *Detective Canales provided*

*repeated assurances to appellant, asserting many times that the two were "just talking."*

The detective there also assured the suspect that he was not "here to hurt" him. When the suspect got dangerously close to a definitive request for counsel with the observation that he "felt kind of comfortable, better with a lawyer," the resourceful detective parried it with the non-responsive response, "We're talking;" and they kept talking. Judge Hollander explained that a combination of half-truths and dodges rendered the required *Miranda* message unclear:

> In particular, *[the detective] never undertook to make clear to appellant that the two were no longer "just talking"*; he did not dispel the notion that no "harm" would come to appellant if he made a statement; and *he did not clarify that the truth would "jeopardize" appellant.* Therefore, *the advisement remained fatally flawed.* For this reason, we conclude that the court erred by denying appellant's motion to suppress.

*Id.* at 49, 882 A.2d 330 (emphasis supplied).

 We are not for a moment suggesting that a police investigator, whose job after all is to get a confession, must go beyond the mandated text of *Miranda* to extol its virtues or sing its praises. That is not required and is not to be expected. In substantially delivering the required text of *Miranda*, however, the interrogator should not, even in subtle ways, seek to undercut its essential message. Police editorializing is seldom pro-*Miranda*.

### The Allocation of the Burden

As we make our independent constitutional determination as to whether the *Miranda* warnings were adequately communicated to the appellee and as to whether the appellee's waiver of the *Miranda* rights was valid, the burden, of course, is on the State to prove that *Miranda* was satisfied. In *McIntyre v. State*, 309 Md. 607, 614–15, 526 A.2d 30 (1987), Chief Judge Robert Murphy wrote for the Court of Appeals:

In undertaking to prove a waiver of *Miranda* rights, "*a heavy burden rests on the government to demonstrate that the defendant knowingly and* intelligently waived his privilege against self-incrimination and his right to *retained or appointed counsel.*" *Miranda, supra,* 384 U.S. at 475, 86 S.Ct. 1602.

(Emphasis supplied).

Judge Hollander similarly pointed out for this Court in *Freeman v. State,* 158 Md.App. 402, 425, 857 A.2d 557 (2004):

If the State seeks to rely on a waiver of rights, ... it carries "a heavy burden" to show "that the defendant knowingly and intelligently waived his privilege against self-incrimination."

*See also Logan v. State,* 164 Md.App. at 38–39, 882 A.2d 330.

In *Smith v. State,* 186 Md.App. 498, 519, 974 A.2d 991 (2009), this Court recently pointed out that the allocation of the burden of proof, which is initially on a defendant to show the threshold applicability of *Miranda,* switches, once applicability is established, to the State to show the satisfaction of *Miranda.*

The passage from Question # 1 [applicability] to Question # 2 [satisfaction] is also vitally important because *a critical switch occurs in the allocation of the burden of proof. If Miranda is,* indeed, *applicable* and the merits of a confession are before the court, *the burden properly is allocated to the State to show that the Miranda requirements were satisfied* (and that the Fifth Amendment privilege was thereby vindicated). This is so because the burden of proving the admissibility of a challenged confession is always on the State.

(Emphasis supplied).

In this case, identifying the evidentiary tie-breaker is not that critical, however, because our call is not a close one.

### Was the Waiver Made "Knowingly"?

Our precise concern in this case is with the quality of

the appellee's waiver of his *Miranda*-based right to counsel.[4] More specifically, our concern is not with whether that waiver was voluntary (it was) but with whether it was a "knowing" waiver. The answer to that turns, in major measure, on the adequacy of the advice that the appellee was given by the police. In *Moran v. Burbine,* 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986), Justice O'Connor described the two-pronged nature of a valid *Miranda* waiver:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, *the waiver must have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it.*

(Emphasis supplied). *See also North Carolina v. Butler,* 441 U.S. 369, 373, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979); *Logan v. State,* 164 Md.App. at 37–38, 882 A.2d 330.

In this case we have serious qualms about whether the appellee understood "the consequences of the decision to abandon" his right to an attorney. After all of the discussion about the right to counsel's only applying to a specific discussion of the incident, the appellee sought to clarify that the impending discussion would, indeed, be about the incident. He expressly asked Detective Barba whether the consequences of abandoning his right to counsel could be that he could incriminate himself. Detective Barba, however, never explained that he could, indeed, incriminate himself and, after acknowledging that they would be talking about the case,

----

4. The appellee also enjoyed a Sixth Amendment right to counsel. On the charges of murder, he had been presented before a commissioner on August 5, 2007, eight days before being questioned by Detective Barba. At that point he became "the accused." In the context of an interrogation session, however, the two rights to counsel rise and fall together. A valid *Miranda* waiver of counsel would serve to waive the Sixth Amendment right as well in that particular setting. *Patterson v. Illinois,* 487 U.S. 285, 108 S.Ct. 2389, 101 L.Ed.2d 261 (1988). The flip side of that coin, of course, is that if the waiver of the *Miranda*-based right to counsel is invalid, the waiver of the Sixth amendment right is invalid as well.

distracted him by telling him only what the rules would be if they were not talking about the case. Shorn of all the "uhs" and "ahs," the critical exchange was:

MR. LUCKETT: I'm sorry, if I say yes [to going forward without a lawyer], *we're going to discuss the incident, right?*

DETECTIVE BARBA: *Mm-hmm. [Yes].*

MR. LUCKETT: *Would I be setting myself up?*

MALE VOICE: Huh?

MR. LUCKETT: *Would I be setting myself up? I mean, I'm looking toward you for answer[s]. You know what I'm saying. We're going to discuss the case without my lawyer[?]*

(Emphasis supplied).

Unquestionably, "Would I be setting myself up?" meant, "Would I be incriminating myself?"; "Would I be saying something that could hurt me at my trial?" Detective Barba's answer was bizarre. It was the way political figures answer tough questions on Sunday morning talk shows. It was totally non-responsive to the question. Instead of telling the appellee whether he would be "hurting" himself in this circumstance, he told him that he would not be hurting himself in some other circumstance.

DETECTIVE BARBA: Okay, *if we discuss any matters outside of the case, you don't need a lawyer present* at all. Period. Okay? We can talk about anything but the case.

MR. LUCKETT: *So I won't be hurting myself?*

DETECTIVE BARBA: *If we talk about anything but the case.* Okay.

MR. LUCKETT: *Mm—hmn*

(Emphasis supplied).

That answer was out of left field. It had nothing to do with what was about to happen and nothing to do with the appellee's concern. The question was, "So I won't be hurting myself?" Time and time again Detective Barba avoided giving a direct answer to the appellant's questions by answering

some other question that had not been asked. The answer was, "If we talk about anything but the case." The two were clearly talking across each other, and there was no meeting of the minds. The appellee asked about but was never told of "the consequences of abandoning" his right to counsel. It somehow reassured him that he would not "be hurting [him-]self" in this case, as he then proceeded to waive counsel. In the words of *Missouri v. Seibert*, 542 U.S. 600, 613, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004), "[B]ewilderment [is] an unpromising frame of mind for knowledgeable decision."

### Extraneous Truth Can Be As Distracting As Extraneous Falsehood

Our holding is that the appellee's waiver of his right to counsel on August 13 was not made knowingly because of our conclusion that the *Miranda* advisements, as a totality, failed effectively to apprise him of what he was entitled to be told. As we make our own independent constitutional appraisal and apply the law to the facts of the case, let us assure the State that we are not applying a *per* se rule and that we are appraising the totality of the circumstances, two of the charges that the State levels against Judge Green.

*Miranda* itself remains the firm foundation. In the wake of the appellee's desperate importunings as to whether he would be "hurting himself," would be "setting himself up," by talking about the case without counsel present, Detective Barba's artful dodging with a non-answer ipso facto failed to inform the appellee of "the consequences of forgoing" that right. *Miranda* was explicit with regard to the content of such a warning.

> This warning is needed in order *to make him aware* not only of the privilege, but also *of the consequences of forgoing it. It is only through an awareness of these consequences that there can be any* assurance of oral *understanding and intelligent exercise of the privilege.*

384 U.S. at 469, 86 S.Ct. 1602 (emphasis supplied).

Detective Barba's repeated assurances of "being here to help" the appellee and of being able to "help" him by "present-

ing his side of the story" tended to obscure any awareness by the appellee that he "was not in the presence of persons acting solely in his interest." As *Miranda* explained:

> Moreover, this warning may serve *to make the individual more acutely aware* that he is faced with a phase of the adversary system—that *he is not in the presence of persons acting solely in his interest.*

*Id.* (emphasis supplied)

 The State contends that even if Detective Barba's statements were misleading, the appellee's "understanding of his rights ... were not affected by Detective Barba's comments." Its protestation that, even if the *Miranda* advisements were inadequate and ineffective, the appellee was nonetheless aware of them rings hollow in the face of *Miranda's* stern command.:

> The Fifth Amendment privilege is so fundamental to our system of constitutional rule and *the expedient of giving an adequate warning* as to the availability of the privilege *so simple, we will not pause to inquire in individual cases whether the defendant was aware of his rights without a warning being given. Assessments of the knowledge the defendant possessed,* based on information as to his age, education, intelligence, or prior contact with authorities, *can never be more than speculation; a warning is a clearcut* fact. More important, whatever the background of the person interrogated, a *warning at the time of the interrogation is indispensable* to overcome its pressures and to insure that the individual knows he is free to exercise the privilege at that point in time.

*Id.* at 468–69, 86 S.Ct. 1602 (emphasis supplied).

Our holding is based on the totality of everything that was said in the course of the *Miranda* discussion. *Holmes v. State,* 116 Md.App. 546, 553, 698 A.2d 1139 (1997); *Logan v. State,* 164 Md.App. at 40, 882 A.2d 330. The essential message was obscured not simply by things that were said that were wrong, but by too much having been said. The appellee, to be sure, may have been told, in passing, about his right to

counsel, but more time and more words were spent in telling him about when he did not need counsel than in telling him about when he did need counsel. What he needed to hear could easily have been lost in the gratuitous and extraneous welter of what he did not need to hear.

The insidious effect of extraneous chatter does not necessarily depend on whether the chatter is true or false. It is insidious simply because it is extraneous. It is insidious because its effect is to obscure the core message. It distracts attention from that core message. When we assess the over-all impact of a message, we do not pick out and focus on every fifth sentence that is part of the official message, for instance, ignoring everything extraneous in between. An example may illustrate the point. We would not presume to suggest that Oliver Wendell Holmes's 1881 classic *The Common Law* is not correct in its every line. But if a *Miranda* advisement were to recite a paragraph from it before mentioning the first *Miranda* warning and were then to quote a second Holmesian paragraph before slipping in the second warning and so on throughout the exercise, the *Miranda* message may well have been invalidated by material that was unimpeachable in every syllable. The core message can be lost in the high grass of extraneous truth as well as in the wilds of extraneous false-hood.

A message that says everything can be a message that says nothing. There is such a phenomenon as informa-tional overload. It is a quantitative thing as well as a qualita-tive thing. To be effective a message should not only be accurate; it should be simple. We end on the note we struck at the outset of this opinion: The police interrogator will be ill-advised to stray too far from the canonical text of *Miranda v. Arizona* itself.[5]

---

5. We are not insisting upon a "verbatim recital." See *California v. Prysock,* 453 U.S. 355, 360–61, 101 S.Ct. 2806, 69 L.Ed.2d 696 (1981); *Duckworth v. Eagan,* 492 U.S. 195, 203, 109 S.Ct. 2875, 106 L.Ed.2d 166 (1989); *Rush v. State,* 403 Md. 68, 85–90, 939 A.2d 689 (2008).

## A Caveat to Readers

Advocates are admonished not to read this opinion over-broadly. Our only actual holding is that, under the totality of the circumstances, Judge Green's decision to suppress the third statement given to Detective Barba on August 13, 2007, is affirmed. We have made, to be sure, serious comments about various greater and lesser infirmities in those advisements. They should be taken to heart. We are not holding, however, that any one of those infirmities, standing alone, would be a sufficient basis for suppressing an inculpatory statement. On the other hand, we are by no means holding that any one of those infirmities, standing alone, would not be a sufficient basis for suppressing an inculpatory statement in a given case. Enjoying the luxury of the totality approach, it is simply unnecessary for us to calibrate suppressability more finely.

**JUDGMENT AFFIRMED; COSTS TO BE PAID BY PRINCE GEORGE'S COUNTY.**

---

There is a big difference between a minor step or two over the line and wandering out of the ballpark.