993 A.2d 25

**STATE of Maryland**

v.

**Terris Terrell LUCKETT.**

**No. 122 Sept.Term, 2009.**

Court of Appeals of Maryland.

April 14, 2010.

362

Glen F. Ivey, State's Atty. (Douglas F. Gansler, Atty. Gen. of Maryland and Carrie J. Williams, Asst. Atty. Gen., Baltimore, MD), on brief for Petitioner.

Paul W. Schmidt (M. Alexia dePottere–Smith and Kimberly Olvey Branscome of Covington & Burling, LLP, Washington, DC; Harry J. Trainor, Jr. of Trainor, Billman, Bennett, Milko & McCabe, LLP, Annapolis, MD), on brief for Respondent.

ARGUED BEFORE BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY, ADKINS and BARBERA, JJ.

BARBERA, Judge.

We decide in this case whether a confession that Respondent Terris Terrell Luckett gave to the police complied with the dictates of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The Circuit Court for Prince George's County ruled that the police did not comply with the requirement of *Miranda* that a suspect be properly advised of the right to counsel that attends custodial interrogation. The Circuit Court granted Respondent's motion to suppress the statement he gave to the police following what the court ruled was a constitutionally defective advisement.

The State challenged the Circuit Court's ruling by filing an interlocutory appeal pursuant to Maryland Code (2006 Repl. Vol.), § 12–302(c) of the Courts and Judicial Proceedings Article. Upon its independent review of the suppression ruling, the Court of Special Appeals agreed with the Circuit Court that the police had violated *Miranda* and affirmed the suppression order. *State v. Luckett*, 188 Md.App. 399, 981 A.2d 835 (2009).

We granted the State's petition for writ of certiorari to review the judgment of the Court of Special Appeals. We now affirm that judgment.

I.

Respondent stands charged by indictment with two counts each of first-degree murder and use of a handgun in the commission of a crime of violence. He filed a motion to suppress three statements he had made to the police, only the

last of which is the subject of this appeal. The four-day hearing on the suppression motion was followed by the Circuit Court's issuance of a written opinion denying the motion as to the first and second statements and granting the motion with respect to the third statement. We adopt portions of the Court of Special Appeals' recitation of the facts underlying the crimes, the suppression motion, and the Circuit Court's decision: [1]

On August 2, 2007, Tunja Luckett, Respondent's wife, was found dead of a gunshot wound at the couple's Fort Washington home. On that same day, John Scales was shot to death at his barbershop in Clinton. On August 3, charges were filed against Respondent, charging him with both murders. Respondent himself, however, was not yet apprehended. On August 4, Prince George's County Police Officer Stephen Fox responded to the Southern Avenue Metro Station, where Respondent had reportedly leaped backward from the Metro platform directly into the path of an oncoming train.

Respondent was pulled from the tracks and rushed by helicopter to the Prince George's County Hospital. Both legs were crushed and, in the course of two operations over the next two days, both of Respondent's legs were amputated. In his meticulously thorough 14–page Opinion of the Court, [the suppression hearing judge] began with a summary that made this bizarre string of events comprehensible.

The state essentially alleges that Mr. Luckett believed that his wife was having an affair with his son's football coach. Mr. Luckett is alleged to have killed his wife and after doing so, gone to the football coach's place of business, a barber shop, and proceeded to kill the football coach on August 2, 2007. On August 4, 2007 having what can best be described as "shooter's remorse," Mr. Luckett

---

1. We have modified the recitation to substitute the term "Respondent" for the Court of Special Appeals' use of the term "the appellee," when referring to Mr. Luckett.

attempted to take his life in two ways. First, he slit his wrists. Failing in that attempt, Mr. Luckett went to a Metro station a little after two in the afternoon and threw himself in front of a moving Metro train.

### The First Statement to Officer Fox

When he first arrived at the hospital, Respondent spontaneously spoke to Officer Fox, who had accompanied him to the hospital from the Metro station. Respondent volunteered to Officer Fox that he had not meant to kill his wife but that he had meant to kill Scales, because he believed that Scales was having an affair with his (Respondent's) wife. Respondent referred to Scales as his "enemy" and said that he had wanted to kill Scales for eight and a half months. Respondent further stated that after he shot Scales, he threw the gun out of the car window. He also stated that after the shootings, he tried to slit his wrists because he did not want to go to jail.

[The Circuit Court] ruled that Respondent's statements to Officer Fox were totally spontaneous and were not in response to any interrogation. *Miranda v. Arizona*, therefore, did not apply. *Smith v. State*, 186 Md.App. 498, 520–22, 974 A.2d 991 (2009). The judge ruled:

> There is no evidence that either officer interrogated or came close to interrogating Mr. Luckett in any way. These statements were volunteered by Mr. Luckett. "Volunteered statements of any kind are not barred by the Fifth Amendment." *Miranda v. Arizona*, 384 U.S. 436, 478, 86 S.Ct. 1602, 16 L.Ed.2d 694.

The correctness of that ruling is not before us on this appeal.

### The Second Series of Statements to Detective Selway

On the next day, August 5, Detective Brian Selway, of the Homicide Division, took over the duty of being posted as guard at Respondent's hospital room. He came on duty at 7 A.M. Respondent awoke between 10:15 and 10:20 A.M.

and immediately started talking. [The] Opinion of Court again well summarized Detective Selway's initial concern and his observations with respect thereto[:]

Det. Selway was concerned with Mr. Luckett's level of alertness and asked him questions such as who the President of the United States was and what the Detective's first name was. Answering correctly, Det. Selway observed Mr. Luckett to be alert and responsive. Mr. Luckett also answered questions of hospital personnel and was aware of his surroundings. Selway watched as Mr. Luckett joked with the hospital staff when they came into the room to monitor his medicines. Through the conversation Mr. Luckett revealed that he was aware an arrest warrant had been issued for him.

At 10:33 A.M. Detective Selway read Respondent his *Miranda* warnings from the small business card he carried in his wallet....

You have the right to remain silent. Anything you say can and will be used against you in a court of law. You have the right to talk to a lawyer and to have him with you during questioning. If you cannot afford a lawyer, one will be appointed for you before a statement is taken, if you wish. If you decide to give a statement, you still have the right to stop at any time so you may talk to a lawyer.

Respondent waived those rights by saying, "I understand." From then until 2:20 P.M., Detective Selway simply listened as Respondent talked. Respondent reaffirmed that he believed that his wife had been having an affair with their son's football coach. He repeated his earlier statements to Officer Fox that he did not mean to kill his wife and that he threw the gun away after shooting Scales at the barbershop. He also told Detective Selway that he kept a journal under the mattress in his bedroom, and he asked Detective Selway to retrieve it. At approximately 2:15 P.M. a District Court Commissioner arrived at Respondent's intensive care room. Respondent, in Detective Selway's presence, told the Commissioner, "I know what I did was

wrong." Respondent then asked, "Is there any way I can get off the death penalty?" The Commissioner responded that she could not give legal advice.

[The Circuit Court's] primary concern with respect to those statements was whether Respondent was in a sufficiently lucid state 1) to make a free and voluntary confession and 2) to make a free and voluntary waiver of his *Miranda* rights. [The court] found that Respondent was lucid and rational and ruled that the motion to suppress those statements would, therefore, be denied[:]

> [T]he Court finds Detective Selway to be believable and places great weight on his testimony. Although Det. Selway was initially concerned about Mr. Luckett's state of mind, he concluded [that] Mr. Luckett was lucid after asking him non-interrogational questions. The Court finds that Mr. Luckett understood what he was saying and was not improperly coerced by Detective Selway into giving these statements. The Court concludes that the statements made to Detective Selway and the statement made in the presence of the Commissioner, Detective Selway and Detective Codero was made freely and voluntarily.

### The Third Statement to Detective Barba

This appeal by the State is taken only from [the Circuit Court's] decision to suppress a third statement, given by Respondent to Detective Matthew Barba on August 13, 2007. Detective Barba briefly visited Respondent in his hospital room on August 8, identified himself as the lead investigator in the two homicides with which Respondent was charged, dropped off a business card, and said that he would be back on another day. Detective Barba returned on August 13 with audio/video equipment and a technician with the hope of conducting a videotaped interview with Respondent.

*Luckett,* 188 Md.App. at 405–09, 981 A.2d at 838–41.

The Circuit Court recited in its written opinion what happened next:

On August 13, 2007, at 12:35 p.m. Detective Barba along with Michael Coatley, an audio technician, arrived at Mr. Luckett's hospital room. After identifying himself Detective Barba stated that Mr. Luckett immediately engaged in conversation with him asking him if he had found the tapes. Detective Barba was unsure as to what Mr. Luckett was asking. Barba indicated that he would "help him out" but that he needed to get a waiver first. Barba advised Luckett that he had certain rights. Mr. Luckett asked about his kids, his mother and grandmother.

With equipment set up, at approximately 12:52 p.m. Detective Barba began reading Mr. Luckett his rights under *Miranda v. Arizona*[:]

DETECTIVE BARBA: Like, like I said, I'm not here, I'm here to help.

MR. LUCKETT: Whatever you need.

DETECTIVE BARBA: Okay. I'm going to explain everything to you okay, um, I'm Detective Barba, okay, I introduced myself last week. I'm Detective Barba of the Prince George's County Police Department, okay.

MR. LUCKETT: Yes.

DETECTIVE BARBA: I'm going to read you your rights for this particular interview—

MR. LUCKETT: Okay.

DETECTIVE BARBA:—that we're going to have, okay.

MR. LUCKETT: Yes.

DETECTIVE BARBA: You do have rights. I'll also explain that we have audio and video on right now, you do understand that?

MR. LUCKETT: Yes.

DETECTIVE BARBA: Right? Okay. Now I'll read everything just like were, just call [sic] like *Miranda* rights. Okay.

MR. LUCKETT: Okay.

DETECTIVE BARBA: If you don't understand anything that I'm saying to you, stop me.

MR. LUCKETT: Okay.

DETECTIVE BARBA: Okay, I have no problem with that all right. Now I'm going to read everything verbatim, okay.

MR. LUCKETT: Yes.

DETECTIVE BARBA: And we'll go from there. All right, this is an advice of rights and waivers form, right here okay.

MR. LUCKETT:—

DETECTIVE BARBA: I'm going to show it to you afterward. You want to move your thing up a little bit?

MR. LUCKETT: Yeah, let me see that.

DETECTIVE BARBA: Okay. This is—rights and waivers form.

MR. LUCKETT: I understand[.]

DETECTIVE BARBA: For our Prince George's County Police Department. Today's date is August 13, 2007 and the time is 12:52, okay. Um, I am now going to read you your rights under the law. If you do not understand something that I say to you, please stop me and I'll explain them to you, okay?

MR. LUCKETT: Yes.

DETECTIVE BARBA: You have the right to remain silent, if you choose to give up this right, anything that you say can be used against you in court.

MR. LUCKETT: Yes.

DETECTIVE BARBA: Okay. You have the right to talk to a lawyer before you are asked any questions to have a lawyer present with you while you're being questioned, that's about this case specifically.

MR. LUCKETT: Okay.

DETECTIVE BARBA: Like I said, if we want to talk about the Redskins, you don't need a lawyer for that because it does not concern—okay. Uh, if you want a lawyer and cannot afford, uh, a lawyer will be provided with you at not [sic] cost, in a public defender, things

[sic]—or you can get a private attorney. If you want to answer questions now without a lawyer, you still have the right to stop answering questions at any given time.

MR. LUCKETT: Okay.

DETECTIVE BARBA: Now, you understand that? Do you understand these rights?

MR. LUCKETT: Yes.

DETECTIVE BARBA: Okay—that's you understand just check yes and then initial if you understand those rights.

MR. LUCKETT: Just check yes?

DETECTIVE BARBA: If you understand the rights that I'm giving you.

MR. LUCKETT: Yeah.

DETECTIVE BARBA: And then initial. Okay. Have you been, uh, do you want to make a statement at this time without a lawyer present? And that could be the verbal one. We're not [background noise] written, normally I would take a written one, part of it will be a verbal that would be us discussing the incident back and forth, do you want to do that[?]

[Crosstalk]

MR. LUCKETT: I'm sorry, if I say yes, we're going to discuss the incident right?

DETECTIVE BARBA: Mm-hmm.

MR. LUCKETT: Would I be setting myself up?

MALE VOICE: Huh?

MR. LUCKETT: Would I set, would I be setting myself up?

MALE VOICE: You—

MR. LUCKETT: I mean I'm, I'm looking toward you for answer you know what I'm saying?

MALE VOICE: Now which is—would he be asking you.[2]

---

**2.** The record on appeal includes the videotape recording of the exchange between Detective Barba and Respondent. It is apparent from

DETECTIVE BARBA:—

MR. LUCKETT:—we're, we're going to discuss the case—

DETECTIVE BARBA: You—

MR. LUCKETT:—without my lawyer.

DETECTIVE BARBA: Okay, if we discuss any matters outside of the case, you don't need a lawyer present at all period, okay.

MR. LUCKETT: So—

DETECTIVE BARBA: We can talk about anything but the case—

MR. LUCKETT: So I won't be hurting myself.

DETECTIVE BARBA: If we talk about anything but the case, okay.

MR. LUCKETT: Mm—hmm.

DETECTIVE BARBA: I'm just letting you know that you do have rights okay.

MR. LUCKETT: Okay.

DETECTIVE BARBA: When we are discussing matters of the case, when I ask you something specifically—

MR. LUCKETT: Mm—hmm.

DETECTIVE BARBA:—or if you tell me something specifically, you have a right to have a lawyer present here, okay?

MR. LUCKETT: Okay.

DETECTIVE BARBA: What you're doing here is that you are giving up a right to having a lawyer present to tell me your side, okay.

MR. LUCKETT: Okay.

DETECTIVE BARBA: You don't have to do that, Okay.

the videotape that the "Male Voice" is that of a person who was positioned out of range of the camera. It is also apparent that Respondent's statements, "Would I set, would I be setting myself up?" and "I mean I'm, I'm looking toward you for answer you know what I'm saying?" are directed to that off-camera "male voice."

MR. LUCKETT: Right.

DETECTIVE BARBA: But for me to be able to present your side—

MR. LUCKETT: Okay.

DETECTIVE BARBA:—along with everything else that I'll be presenting—

MR. LUCKETT: Mm—hmm.

DETECTIVE BARBA: Okay, then that goes on my integrity.

MR. LUCKETT: All right, I know what you're saying.

DETECTIVE BARBA: I'm going to give the full version of what's going on.

MR. LUCKETT: Okay.

DETECTIVE BARBA: Okay. Do you understand that?

MR. LUCKETT: Correct.

DETECTIVE BARBA: Okay. So you understand that you do have rights.

MR. LUCKETT: Right.

DETECTIVE BARBA: You don't have to talk to me.

MR. LUCKETT: Correct.

DETECTIVE BARBA: Okay. Do you want to make a statement at this time without a lawyer present?

MR. LUCKETT: Yes.

At the end of that discussion, Respondent gave a lengthy statement describing his belief that his wife had been having an affair with Mr. Scales, his activities during the months leading up to the murders, and the murders themselves. Respondent repeated his earlier statements to the police that he did not mean to kill his wife but he did intend to kill Mr. Scales. Respondent said that he knew what he had done was wrong, and he was willing to "accept my punishment and be accountable for my actions." He stated that he hoped Detective Barba would not "throw the book at me."

In its written opinion, the Circuit Court set forth Respondent's arguments for why the videotaped statement to Detective Barba should be suppressed:

Mr. Luckett's counsel argues that Detective Barba's advice is defective in two respects: 1. The five-word statement of "you don't need a lawyer" is false and not a correct statement of the law. 2. The offer to help in presenting the case, the promise to help and the promise to investigate are violation[s] of *Hillard v. State,* 141 Md.App. 199, 784 A.2d 1134 (2001).

The Circuit Court addressed the "you don't need a lawyer" argument first:

Detective Barba's statement "you don't need a lawyer" is not a correct recitation of the law and should never be spoken by any law enforcement officer to a person in custody under any circumstances. These words were related to Mr. Luckett two times in the videotape and according to Detective Barba, stated at least two other times. It appears from Detective Barba's statement that he may have stated the same words before the tape was turned on as well. Any statement that could possibly lead the defendant to misconstrue his rights under *Miranda* is contrary to the law requiring a knowing and voluntary waiver.

The Circuit Court also noted that Detective Barba should have known that *anything* Respondent might say during interrogation could compromise his defense:

By the ninth day of investigating this matter, Detective Barba, a seasoned Prince George's County Officer, either knew or should have known that the defense would allege that Mr. Luckett was not criminally responsible for his actions, or that his sanity would be questioned. Any statement shedding light on his mental capacity or understanding, regardless of whether it was about this case or not, could be relevant and Mr. Luckett would have greatly benefitted from a counsel. Mr. Luckett's entire life was more or less in question at this time. This was not simply a "domestic" case as the State believes. Much more was

riding on the questioning of Mr. Luckett at this stage of the investigation of "the case."

The Circuit Court ruled that the exchange between Detective Barba and Respondent, considered in its entirety, failed to convey to Respondent his right to have a lawyer present during the interrogation: "The Detective's offer to help was not harmful by itself, but his statement, 'you don't need a lawyer,' combined with the Detective's other statement, without further explanatory statements from the Detective to Mr. Luckett make this advice of rights invalid." Consequently, the court granted the motion to suppress the statement that Respondent gave to Detective Barba on August 13, 2007, on the basis that it was given in violation of *Miranda*.

The Circuit Court did not decide Respondent's allegation that Detective Barba's "offer to help in presenting the case, the promise to help and the promise to investigate" was the product of one or more improper promises and thereby involuntary under Maryland's common law. The court explained that there was no need to do so because "[t]he State has not asked that the Court make a determination of whether the statement was voluntary."

The State noted an appeal from the grant of Respondent's motion to suppress the statement he gave to Detective Barba. The Court of Special Appeals affirmed the Circuit Court, holding: "[U]nder the totality of the circumstances, the unnecessarily lengthy and rambling discussion about the nature of the *Miranda* rights not only included specifically questionable statements of the law but utterly failed effectively to communicate the message mandated by *Miranda*." *Luckett,* 188 Md.App. at 410, 981 A.2d at 841.

We granted the State's petition for a writ of certiorari to consider the following question:

Did the Court of Special Appeals err in holding that Luckett's August 13, 2007 statement must be suppressed where that holding: 1) expands the concept of "improper inducement" to include situations where the interrogator makes no offers or promises in exchange for a statement; 2) is based

upon a flatly incorrect interpretation of the record; and 3) erroneously concludes that Luckett did not knowingly waive his right to counsel[?]

Upon our independent review of the facts developed at the suppression hearing,[3] we affirm the judgment of the Court of Special Appeals that Respondent's statement to Detective Barba was obtained in violation of *Miranda's* requirement that a suspect be properly advised of the right to counsel. We therefore need not address the State's assertion that the Court of Special Appeals wrongly interpreted the record. We also need not address the State's claim that the Court of Special Appeals wrongly "expand[ed] the concept of 'improper inducement' to include situations where the interrogator makes no offers or promises in exchange for a statement." To the extent that the intermediate appellate court's opinion can be construed as addressing the common law voluntariness of Respondent's statement, it is dicta not necessary to the judgment affirming the Circuit Court's order suppressing Respondent's statement solely because it was obtained in violation of *Miranda*.[4]

---

3. In reviewing the Circuit Court's ruling on the motion, we "consider only the facts and information contained in the record of the suppression hearing." *Longshore v. State*, 399 Md. 486, 498, 924 A.2d 1129, 1135 (2007). " '[W]e view the evidence and inferences that may be reasonably drawn therefrom in a light most favorable to the prevailing party on the motion,' " here, Respondent. *Owens v. State*, 399 Md. 388, 403, 924 A.2d 1072, 1080 (2007), *cert. denied*, 552 U.S. 1144, 128 S.Ct. 1064, 169 L.Ed.2d 813 (2008) (quoting *State v. Rucker*, 374 Md. 199, 207, 821 A.2d 439, 444 (2003)). We defer to the motions court's factual findings and uphold them unless they are shown to be clearly erroneous. We, however, make our " 'own independent constitutional appraisal,' " by reviewing the relevant law and applying it to the facts and circumstances of this case. *Longshore*, 399 Md. at 499, 924 A.2d at 1136 (quoting *Jones v. State*, 343 Md. 448, 457, 682 A.2d 248, 253 (1996)).

4. Our holding in this case affirming suppression of the confession on the basis of the *Miranda* violation means that the State may not use the confession in its case-in-chief. Should Respondent testify on his own behalf at trial in a manner that contradicts that confession, the State may want to impeach Respondent with that confession. The State would be permitted to employ the statement for impeachment purposes

## II.

 The Fifth Amendment to the United States Constitution, which applies to the States through the Fourteenth Amendment, *Malloy v. Hogan,* 378 U.S. 1, 7, 84 S.Ct. 1489, 1493, 12 L.Ed.2d 653, 659 (1964), provides in relevant part that "[n]o person . . . shall be compelled in any criminal case to be

---

if, and only if, the Circuit Court first rules the confession was voluntary as a matter of federal and state constitutional law and Maryland common law. *See Harris v. New York,* 401 U.S. 222, 224–26, 91 S.Ct. 643, 645–46, 28 L.Ed.2d 1, 3–5 (1971) (declaring that statements inadmissible under *Miranda* in the prosecution's case-in-chief are not barred for all purposes, provided that "the trustworthiness of the evidence satisfies legal standards," and holding that the prosecution properly impeached the defendant on cross-examination with use of a *Miranda*-violative statement, not challenged as involuntary, that contradicted the defendant's direct testimony); *Oregon v. Hass,* 420 U.S. 714, 721, 95 S.Ct. 1215, 1220, 43 L.Ed.2d 570, 577 (1975) (applying the rule of *Harris* to permit the prosecution to use a *Miranda*-violative statement during its rebuttal case to impeach the defendant's direct testimony that contradicted the statement); *State v. Kidd,* 281 Md. 32, 40–43, 50–51, 375 A.2d 1105, 1110–12, 1115–16 (1977) (recognizing the rule of *Harris* and *Hass,* but holding that the rule did not apply in that case because the *Miranda*-violative statement did not contradict the defendant's direct testimony); *State v. Franklin,* 281 Md. 51, 60–61, 375 A.2d 1116, 1121–22 (1977) (applying *Harris* and *Hass* to hold that the State properly impeached the defendant with what this Court "assumed" was a *Miranda*-violative statement, not challenged as involuntary, that contradicted the defendant's direct testimony), *cert. denied,* 434 U.S. 1018, 98 S.Ct. 739, 54 L.Ed.2d 764 (1978); *Hall v. State,* 292 Md. 683, 688–89, 441 A.2d 708, 711 (1982) (applying *Harris* and *Hass* to uphold the prosecution's use of the defendant's *Miranda*-violative statement to impeach the defendant's direct testimony that contradicted the statement).

We have mentioned that the Circuit Court did not rule on Respondent's voluntariness claim because the State did not press for a ruling on the issue. Presumably the court was of the view that, unless and until the State sought to use the statement for impeachment purposes, there was no need to decide the matter. Ordinarily, however, when a motion to suppress a statement raises both *Miranda* and voluntariness concerns, the court should rule at the suppression stage on the voluntariness of the statement, even if the court also rules that the statement was obtained in violation of *Miranda.* A voluntariness ruling at that time has obvious benefits. The evidence that was developed on the issue is fresh in the minds of counsel and the court, the issue is fully ripe for decision, and a ruling at that time makes clear to both parties before trial the extent to which, if at all, the State may use the defendant's statement at trial.

a witness against himself." U.S. CONST. amend. V. "To give force to the Constitution's protection against compelled self-incrimination, the Court established in *Miranda* 'certain procedural safeguards that require police to advise criminal suspects of their rights under the Fifth and Fourteenth Amendments before commencing custodial interrogation.' " *Florida v. Powell,* —— U.S. ——, ——, 130 S.Ct. 1195, 1203, 175 L.Ed.2d 1009, 1018 (2010) (quoting *Duckworth v. Eagan,* 492 U.S. 195, 201, 109 S.Ct. 2875, 2880, 106 L.Ed.2d 166, 177 (1989)). *Accord Blake v. State,* 381 Md. 218, 230, 849 A.2d 410, 417 (2004), *cert. dismissed as improvidently granted,* 546 U.S. 72, 126 S.Ct. 602, 163 L.Ed.2d 406 (2005).

The Supreme Court, "intent on 'giv[ing] concrete constitutional guidelines for law enforcement agencies and courts to follow,' " *Powell,* 130 S.Ct. at 1203, 175 L.Ed.2d at 1018 (quoting *Miranda,* 384 U.S. at 441–42, 86 S.Ct. at 1611, 16 L.Ed.2d at 705), "adopted a set of prophylactic measures to protect a suspect's Fifth Amendment right from the 'inherently compelling pressures' of custodial interrogation," *Maryland v. Shatzer,* —— U.S. ——, ——, 130 S.Ct. 1213, 1219, 175 L.Ed.2d 1045, 1052 (2010) (quoting *Miranda,* 384 U.S. at 467, 86 S.Ct. at 1624, 16 L.Ed.2d at 719). The measures adopted in *Miranda* stemmed from the Court's recognition that "incommunicado interrogation" in a "police-dominated atmosphere," involves psychological pressures that "work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." 384 U.S. at 445, 467, 86 S.Ct. at 1612, 1624, 16 L.Ed.2d at 707, 719.

The prophylactic measures developed in *Miranda* took the form of the now-familiar warnings that law enforcement personnel must deliver to a suspect before undertaking any custodial interrogation:

[A] suspect must be warned prior to any questioning [1] that he has the right to remain silent, [2] that anything he says can be used against him in a court of law, [3] that he has the right to the presence of an attorney, and [4] that if he

cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

*Miranda,* 384 U.S. at 479, 86 S.Ct. at 1630, 16 L.Ed.2d at 726.

■ The third of those warnings, at issue in the present case, addresses the "particular concern that '[t]he circumstances surrounding in-custody interrogation can operate very quickly to overbear the will of one merely made aware of his privilege [to remain silent] by his interrogators.' " *Powell,* 130 S.Ct. at 1203, 175 L.Ed.2d at 1018 (quoting *Miranda,* 384 U.S. at 469, 86 S.Ct. at 1625, 16 L.Ed.2d at 721). "[T]he need for counsel to protect the Fifth Amendment privilege comprehends not merely a right to consult with counsel prior to questioning, but also to have counsel present during any [custodial] questioning[.]" *Miranda,* 384 U.S. at 470, 86 S.Ct. at 1626, 16 L.Ed.2d at 721. And, "[a]s with the warnings of the right to remain silent and that anything stated can be used in evidence against him, this warning is an absolute prerequisite to interrogation.... Only through such a warning is there ascertainable assurance that the accused was aware of this right." 384 U.S. at 471–72, 86 S.Ct. at 1626, 16 L.Ed.2d at 722.

Although the warnings are "invariable," the Supreme Court has "not dictated the words in which the essential information must be conveyed." *Powell,* 130 S.Ct. at 1204, 175 L.Ed.2d at 1018. *See California v. Prysock,* 453 U.S. 355, 359, 101 S.Ct. 2806, 2809, 69 L.Ed.2d 696, 701 (1981) (per curiam) ("This Court has never indicated that the rigidity of *Miranda* extends to the precise formulation of the warnings given a criminal defendant." (internal quotation marks omitted)); *Rhode Island v. Innis,* 446 U.S. 291, 297, 100 S.Ct. 1682, 1688, 64 L.Ed.2d 297, 305 (1980) (safeguards against compelled self-incrimination include *Miranda* warnings "or their equivalent"); *Rush v. State,* 403 Md. 68, 84–89, 939 A.2d 689, 698–701(2008) (discussing same). Nevertheless, the warnings must "reasonably 'conve[y] to [a suspect] his rights as required by *Miranda.*' " *Powell,* 130 S.Ct. at 1204, 175 L.Ed.2d at 1019

(quoting *Duckworth,* 492 U.S. at 203, 109 S.Ct. at 2880, 106 L.Ed.2d at 177).

Of course, the rights accorded by *Miranda* can be waived. *See* 384 U.S. at 475, 86 S.Ct. at 1628, 16 L.Ed.2d at 724; *Blake,* 381 Md. at 236, 849 A.2d at 421 ("The law is clear that a suspect may validly waive *Miranda* rights[.]"). The State has a "heavy burden," however, to establish that a suspect has waived those rights. *Miranda,* 384 U.S. at 475, 86 S.Ct. at 1628, 16 L.Ed.2d at 724. The State "must show that the waiver was knowing, intelligent, and voluntary under the 'high standar[d] of proof for the waiver of constitutional rights [set forth in] *Johnson v. Zerbst,* 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938).'" *Shatzer,* 130 S.Ct. at 1219, 175 L.Ed.2d at 1052 (citation omitted); *White v. State,* 374 Md. 232, 251, 821 A.2d 459, 470 (2003), *cert. denied,* 540 U.S. 904, 124 S.Ct. 262, 157 L.Ed.2d 189 (2003). By this is meant that:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it.

*Moran v. Burbine,* 475 U.S. 412, 421, 106 S.Ct. 1135, 1141, 89 L.Ed.2d 410, 421 (1986) (citation omitted). *Accord North Carolina v. Butler,* 441 U.S. 369, 373, 99 S.Ct. 1755, 1757, 60 L.Ed.2d 286, 292 (1979); *McIntyre v. State,* 309 Md. 607, 614–15, 526 A.2d 30, 33–34 (1987).

In determining the constitutional adequacy of a suspect's waiver of the *Miranda* rights, the totality of the warnings must be examined. *See Moran,* 475 U.S. at 421, 106 S.Ct. at 1141, 89 L.Ed.2d at 421 ("Only if the 'totality of the circumstances surrounding the interrogation' reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived." (citation omitted)); *Powell,* 130 S.Ct. at 1205, 175 L.Ed.2d at 1019–20 (concluding that, "[i]n combination, the two warnings reasonably conveyed Powell's right to have an

attorney present, not only at the outset of the interrogation, but at all times"); *Duckworth,* 492 U.S. at 205, 109 S.Ct. at 2881, 106 L.Ed.2d at 178 (holding that the warnings, "in their totality, satisfied *Miranda*"); *Rush,* 403 Md. at 89–90, 939 A.2d at 701–02 (concluding that "the totality of the advisements, both oral and written," communicated all rights afforded by *Miranda*). But if the warnings, viewed in the totality, in any way misstate the suspect's rights to silence and counsel, or mislead or confuse the suspect with respect to those rights, then the warnings are constitutionally infirm, rendering any purported waiver of those rights constitutionally defective and requiring suppression of any subsequent statement. *See Miranda,* 384 U.S. at 486, 86 S.Ct. at 1629, 16 L.Ed.2d at 725 (stating that "the warnings required and the waiver necessary in accordance with our opinion today are, in the absence of a fully effective equivalent, prerequisite to the admissibility of any statement by a defendant").

We bear these principles in mind as we consider the *Miranda* warnings given to Respondent.

### III.

■ Respondent successfully argued before the Circuit Court and the Court of Special Appeals that the *Miranda* warnings were incorrect and misleading, rendering his *Miranda* waiver "unknowing" and therefore invalid. The State disagrees. The State points out that Detective Barba correctly informed Respondent of all of his *Miranda* rights at the outset of the exchange between the two. The State directs us to the following advisements by Detective Barba. He advised Respondent: "You have the right to remain silent, if you choose to give up this right, anything that you say can be used against you in court." Detective Barba added: "You have the right to talk to a lawyer before you are asked any questions[,] to have a lawyer present with you while you're being questioned. . . ." He further advised: "[I]f you want a lawyer and cannot afford [one], a lawyer will be provided with [sic] you at no cost[,]" and, "If you want to answer questions now without a lawyer, you still have the right to stop answering questions

at any given time." Detective Barbara also asked Respondent if he understood those rights, and Respondent replied that he did.

We agree with the State that those advisements comport with *Miranda*. The problem, however, does not lie in Detective Barba's recitation of the *Miranda* warnings we have just quoted. The problem instead lies in the detective's further "clarifications" and "explanations" of the rights covered by those warnings. As we shall see, it is those comments that nullified what otherwise were proper warnings, and rendered the *Miranda* advisement constitutionally defective.

When advising Respondent that he had "the right to talk to a lawyer before you are asked any questions [and] to have a lawyer present with you while you're being questioned," Detective Barba added, "that's about this case, specifically." Detective Barba followed that statement with an example of the type of exchange that would *not* be considered interrogation accorded protection under *Miranda:* "Like I said, if we want to talk about the Redskins, you don't need a lawyer for that because it does not concern—okay." Following that, Respondent asked whether, in discussing "the incident" without a lawyer, he would be "setting [himself] up" in "discuss[ing] the case without my lawyer." Respondent sought an answer to that concern from either Detective Barba or the unknown male in the room. In answer to Respondent's concern, Detective Barba simply repeated the words that conveyed, in effect, that not all that he and Respondent might discuss during the interrogation was covered by the right to counsel: "Okay, if we discuss any matters outside of the case, you don't need a lawyer present at all period. Okay." Then, when Respondent sought confirmation that he would not "be hurting" himself, Detective Barba again repeated that Respondent did "have rights" but only "[w]hen we are discussing matters of the case." Detective Barba re-emphasized, moreover, that not everything Respondent might say during interrogation was covered by the right to counsel: "When or if you tell me something specifically, you have a right to have a lawyer present here." The detective ended these "advise-

ments" with the following: "What you're doing here is that you are giving up a right to having a lawyer present to tell me your side, okay." Shortly thereafter, Respondent purported to waive his *Miranda* rights by signing the form declaring that he "understood" the rights he was waiving.

Detective Barba did not inform Respondent, as the detective should have done in answer to Respondent's query about incriminating himself, that *anything* Respondent said during interrogation could incriminate him. To the contrary, Detective Barba repeatedly advised Respondent that any of his statements that were not directly related to "the case" (whatever the detective meant by "the case") were outside the purview of the right to counsel and, impliedly at least, not subject to being used against Respondent at trial. Detective Barba's repeated "explanations" of what *Miranda* does and does not protect during interrogation were incorrect as a matter of law.

 *Miranda* covers any custodial exchange that occurs between interrogator and suspect, other than routine booking questions and the like.[5] In other words, the protections afforded by *Miranda* extend to the entirety of the interrogation, from beginning to end, without limitation on the matters discussed. *See Arizona v. Roberson,* 486 U.S. 675, 684, 108 S.Ct. 2093, 2099, 100 L.Ed.2d 704, 715 (1988) (stating that "[a] suspect's request for counsel should apply to any questions the police wish to pose").

 Therefore, no police officer advising a suspect of his rights under *Miranda* should intimate, much less declare affirmatively, a limitation upon the right to counsel. Detective

---

5. *See Pennsylvania v. Muniz,* 496 U.S. 582, 601, 110 S.Ct. 2638, 2650, 110 L.Ed.2d 528, 552 (1990). Note also the exceptions to *Miranda* that the Supreme Court announced in *Illinois v. Perkins,* 496 U.S. 292, 296, 110 S.Ct. 2394, 2397, 110 L.Ed.2d 243, 251 (1990) (conversations between suspects and undercover agents admissible in the absence of *Miranda* warnings) and *New York v. Quarles,* 467 U.S. 649, 656, 104 S.Ct. 2626, 2631, 81 L.Ed.2d 550, 557 (1984) (recognizing a "public safety" exception to the requirement that *Miranda* warnings be given in order to use a suspect's statement as evidence against him at trial).

Barba's statements that the right to counsel applied only to discussion of the specifics of "the case," being wrong as a matter of law, rendered the advisements constitutionally infirm.[6] The constitutional infirmity of the warnings rendered similarly infirm Respondent's subsequent waiver of his *Miranda* rights, because his purported waiver was not "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran*, 475 U.S. at 421, 106 S.Ct. at 1141, 89 L.Ed.2d at 421; *see also Missouri v. Seibert*, 542 U.S. 600, 613, 124 S.Ct. 2601, 2611, 159 L.Ed.2d 643, 656 (2004) (commenting that "[b]ewilderment [is] an unpromising frame of mind for knowledgeable decision").

Accordingly, we reject the State's central theme of the present appeal, which is essentially that, so long as correct *Miranda* warnings are given, the inclusion of other misleading or, as in this case, flatly incorrect advisements concerning those warnings has no adverse effect on the adequacy of the

---

6. Detective Barba's legally incorrect advisements concerning the scope of the right to counsel were enough to render the advisements constitutionally defective, and our conclusion in that regard provides the basis for our disposition in this case. We therefore need not consider the effect of other comments that Detective Barba made during the *Miranda* advisements, and which caught the attention of the Court of Special Appeals. We refer here to Detective Barba's comment at the beginning of the recorded colloquy, "Like, like I said, I'm not here, I'm here to help[,]" and to his comment much later during the colloquy that "But for me to be able to present your side—along with everything else that I'll be presenting, . . . then that goes on my integrity." The Court of Special Appeals noted: "The inevitably seductive effect of repeated assurances that the interrogator is there 'to help' the defendant is that the officer is presented as an alternative source of 'help.' Such a choice is an unspoken inducement to waive the right to counsel." *Luckett*, 188 Md.App. at 419, 981 A.2d at 846.

Any statement on the part of a police officer that attempts to mislead, or has the effect of misleading, a suspect as to the scope of the rights afforded by *Miranda* renders the advisement defective. *See* 2 WAYNE R. LAFAVE, CRIMINAL PROCEDURE § 6.9(c) (3d ed. 2000) ("'[T]here is an absolute prohibition upon any trickery which misleads the suspect as to the . . . dimensions of any of the applicable rights.'"). We caution the police, and those advising them, that this Court will not tolerate any attempt to mislead a suspect about the full scope of the rights afforded by *Miranda*.

warnings. The State's thesis defies common sense, runs directly afoul of the requirement that *Miranda* advisements be analyzed in their totality, and is contrary to the dictates of *Miranda* and its progeny.

We hold that a suspect is not properly informed of his or her *Miranda* rights when a statement of those rights, however correct the statement may be, is nullified by other incorrect statements concerning those rights. In that event, the *Miranda* advisements are constitutionally infirm, a purported "waiver" of those rights is constitutionally invalid, and any statement the police obtain from the suspect during the ensuing interrogation violates *Miranda*. Here, Detective Barba misadvised Respondent of his right to counsel under *Miranda*, rendering invalid his purported *Miranda* waiver and requiring suppression of Respondent's post-"waiver" statement to the detective. The Circuit Court's suppression ruling was correct, as was the judgment of the Court of Special Appeals affirming that order.

**JUDGMENT AFFIRMED; CASE REMANDED TO THE COURT OF SPECIAL APPEALS WITH DIRECTION TO REMAND THE CASE TO THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION; COSTS TO BE PAID BY PRINCE GEORGE'S COUNTY.**