30 A.3d 945

**Khiry Montay MOORE**

v.

**STATE of Maryland.**

**No. 113, Sept. Term, 2010.**

Court of Appeals of Maryland.

Oct. 25, 2011.

Allison Pierce Brasseaux, Asst. Public Defender (Paul B. DeWolfe, Public Defender, Baltimore, MD), on brief, for petitioner.

Cathleen C. Brockmeyer, Asst. Atty. Gen. (Douglas F. Gansler, Atty. Gen. of Maryland, Baltimore, MD), on brief, for respondent.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY,* ADKINS, and BARBERA, JJ.

MURPHY, J.

In the Circuit Court for Prince George's County, a jury convicted Khiry Montay Moore, Petitioner, of first degree felony murder and related offenses, including use of a handgun in the commission of a crime of violence. Petitioner concedes that the State's evidence was sufficient to establish that he committed those offenses on March 11, 2007, but he argues that he is entitled to a new trial on the ground that the State's evidence included an involuntary statement that he made during a custodial interrogation. The Circuit Court denied Petitioner's motion to suppress that statement, and that ruling was affirmed by the Court of Special Appeals in *Moore v. State*, 194 Md.App. 327, 4 A.3d 96 (2010). After Petitioner's convictions were affirmed by the Court of Special Appeals, he filed a petition for writ of certiorari in which he presented a single question for our review:

> Should [Petitioner's] confession, which was obtained when he was on[e] month past his sixteenth birthday, have been suppressed as involuntary given that virtually all of the relevant factors pointed to involuntariness, including the

---

* Murphy, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

fact that, as both the trial court and the Court of Special Appeals found, the police unnecessarily delayed presenting [Petitioner] to a District Court Commissioner in order to interrogate him and the fact that the police ignored thirteen requests by [Petitioner] to speak to his mother?

For the reasons that follow, we shall answer "yes" to that question, and hold that Petitioner is entitled to a new trial at which the State is prohibited from introducing any direct or derivative evidence of Petitioner's inculpatory statement.

## Background

The opinion of the Court of Special Appeals included the following factual summary:

[Petitioner] was arrested on March 21, 2007 at approximately 1:00 a.m. He was taken to police headquarters, where he was interrogated and ultimately confessed. [Petitioner] moved to suppress his confession, which the trial court denied. The videotape of his confession was played for the jury and, as noted, he was convicted of first-degree felony murder, involuntary manslaughter, conspiracy to commit robbery, three counts of attempted robbery with a dangerous weapon and three counts of use of a handgun in the commission of a crime of violence.

\* \* \*

The following evidence was presented at the suppression hearing.

On March 21, 2007, Corporal James Seger was patrolling the Cindy Lane area of Prince George's County while working for the Special Assignment team. He pulled into an apartment complex and observed a group of young people standing outside. When they saw his police cruiser, they walked away. Because it was 1:00 a.m., Corporal Seger stopped them, suspecting curfew violations. [Petitioner] was among the group. Corporal Seger learned that there was an outstanding warrant for [Petitioner]'s arrest stemming from a homicide. [Petitioner] was arrested pursuant to the warrant at 1:09 a.m. and taken to the homicide

section of the Prince George's County Police Department. They arrived between 1:40 a.m. and 2:00 a.m. Corporal Seger placed [Petitioner] in an interview room, pursuant to the instructions of the homicide division. Corporal Seger did not engage in any questioning of [Petitioner] at that time. He simply searched [Petitioner], removed his handcuffs and left him in the room.

Thereafter, Detective David Morissette, who was working the night shift that evening, called Detective Robert Turner, the lead investigator in the case. Detective Turner instructed Detective Morissette to begin talking to [Petitioner]. Accordingly, Detective Morissette entered the interview room shortly after 2:00 a.m. and read [Petitioner] his *Miranda* rights. [Petitioner] initialed beside each advisement and agreed to waive his rights. Detective Morissette began to collect background information from [Petitioner] at that time. He learned that [Petitioner] was sixteen years old, was in the ninth grade and had previously been arrested for theft or unauthorized use of a motor vehicle.

Subsequently, at 2:41 a.m., Detective Timothy Cordero entered the interview room and questioned [Petitioner] until 3:05 a.m. He testified that he entered the room in order to collect "some preliminary background information" for his partner, who was the lead investigator on the case. **Detective Cordero presented [Petitioner] with photographs of his co-defendants and asked [Petitioner] if he recognized the individuals. [Petitioner] stated that he did not recognize them.** Detective Cordero then presented [Petitioner] with the arrest warrant and informed [Petitioner] that he was being charged as an adult with murder as a result of the incident that took place on Daimler Drive. At that time, [Petitioner] asked to call his mother. Detective Cordero denied his request and informed him that he was going to obtain a search warrant for [Petitioner]'s home.

Shortly after Detective Cordero exited the interview room, Detective Robert Turner entered the room at 3:20 a.m. to collect "basic booking information." **He then questioned [Petitioner] about the shooting. Initially, [Petitioner] denied his involvement.**

Detective Turner testified that he left the room at approximately 5:05 a.m. and, shortly thereafter, provided [Petitioner] with a soda. At approximately 5:18 a.m., Detective Turner re-entered the interview room and spoke with [Petitioner] until 6:15 a.m. **He informed [Petitioner] that multiple people had placed [Petitioner] at the scene, whereupon [Petitioner] admitted that he was present and that he had a discussion about the robbery with his co-defendants. [Petitioner] continued to deny that he was the shooter.**

Detective Turner entered the room once more at 6:48 a.m. and [Petitioner] requested to use the restroom. Detective Turner granted the request and he and [Petitioner] stepped out of the interview room until approximately 6:55 a.m. **It was not until 8:05 a.m. that [Petitioner] admitted to Detective Turner that he shot [the victim] by accident.** [Petitioner] further explained that he had been drinking that night, which had impaired his thinking. After obtaining these statements, Detective Turner exited the interview room. At 8:13 a.m., Detective Turner permitted [Petitioner] to make a telephone call. He called his girlfriend at that time.

At 8:35 a.m. Detective Turner re-entered the interview room, followed by Sergeant Troy Harding at 8:40 a.m. The two officers went over [Petitioner]'s confession and exited the room at 8:50 a.m.

Between 9:00 a.m. and 9:05 a.m., Sergeant Harding re-entered the interview room and had a discussion with [Petitioner] about the location of the gun used in the shooting. Sergeant Harding left the room again at 9:25 a.m.

At 1:00 p.m., after the search warrant was executed on [Petitioner]'s home, [Petitioner]'s mother was transported to the police station and was escorted into the interview room, where she and [Petitioner] spoke for approximately fifteen minutes. According to Detective Turner, [Petitioner] was "taken to the jail" at approximately 1:30 p.m., but he did not

know when [Petitioner] was processed, although he knew that there were commissioners at the jail. Detective Turner testified that he did not immediately take [Petitioner] to a commissioner because he "wanted the opportunity to speak to him and explain the charges, get his side of the story" and the officers were "preparing a search warrant" during that time. He explained that the search warrant process took approximately two hours. Although Detective Turner wanted to go to the on-call judge's home to get the warrant signed, the commissioner informed him that the judge's instructions were to wait until he arrived at his office at 8:30 a.m. At that time, the search warrant was signed.

Sergeant Harding expressed similar sentiments, explaining that they were attempting to gather evidence in support of a search warrant and to prevent [Petitioner] from making a call and causing evidence to be disposed of.

The trial court made the following findings:

With regard to the question of the motion to suppress statements made by [Petitioner] during the course of approximately eleven and a half hours of being in the custody of the police, the Court will begin, as a backdrop, by rejecting a delay Type 2 analysis or weighing of the interrogation. That is the type that is deemed to be a necessary delay and immaterial to suppression. So it's rejected as a pure matter.... [A]nd that's because throughout the interrogation there is no information that was gathered that would have served as a basis for obtaining an arrest warrant that was not already in hand. The same is true with regard to information to support application for a search warrant.

Shooters often hide weapons at home and a warrant would have been issued under the circumstances, plus the warrant effort began at a time when [Petitioner] was still protesting that he was innocent....

With regard to the interrogation, I believe that we have to begin with the arrival at the station. And that period of time up until 2:23.58, the Court considers to be a Type

5 delay ... a delay that is for the sole purpose of custodial interrogation, but during which no interrogation actually occurs. Detective Morissette gathered biographical information with the exception of the Advice of Rights and Waiver, but there was no questioning during that period of time.

. . . .

That period of time between 2:43 and 2:59 ... a little over 16 minutes when Detective Cordero was in the interview room, the Court characterizes that as a Type 4, Class II, unnecessary and deliberate delay that violates the prompt presentment requirement and is for the sole purpose of obtaining a confession, and the Court considers that as weighing heavily against a determination of voluntariness.

During the period of time from 3 to 3:19.28, [Petitioner] is alone. That would be a Type 5 delay, one that is for the sole purpose of custodial interrogation, but during which no interrogation occurs. Obviously, that would be of slight weight with regard to the issue of voluntariness.

That period of time from 3:19.28 to 3:37.15, [sic] also a Type 5 delay. More information although redundant in the nature of that obtained by Detective Morissette and Cordero, plus more, [sic] no questioning regarding the crime occurring. And at this period of time—during that period of time Detective Turner is in the room.

**The period of time from 3:37.15 to 5:05.15, an hour and 28 minutes, this is a Type 4 interrogation, weighs heavily against voluntariness** ... That period of time from 5:05 until 5:13.5, the Defendant is alone. This is Type 5. No interrogation is occurring.

From 5:13 to 6:13.26, an hour, interrogation is occurring. This is Type 4, and we give it the appropriate weight. From 6:13.26 to 6:47.06, the Defendant is alone. That is Type 5. Between 6:47.06 and 6:50.27, there is no interrogation occurring. That is also Type 5.

From 6:50.27 to 6:51.57, [Petitioner] is alone. That's Type 5. No interrogation. From 6:51.57 to 6:55.53, this is

Type 5. [Petitioner] was taken to the bathroom and offered breakfast.... From 6:55.53 to 8:05.37, a period of one hour and ten minutes, there is Type 4 interrogation occurring. We give it the appropriate weight.

From 8:05.37 until 8:10.35, [Petitioner] is alone. From 8:10.35 to 8:39, that's also Type 5 as to the period of time before when [Petitioner] is alone.... There is no interrogation during this period of time.

Between 8:30.14 and 8:46 when Detective Harding is there, that's a period of seven minutes. This is Type 4 interrogation. We give it the appropriate weight. Between 8:46 and 8:48.17, that's a three-minute period. It's a mixture of Type 4 and Type 2. The Court deems it to be more of Type 2 insofar as the questioning is an effort to recover the gun and to keep it from falling into the wrong hands.

From 8:48.17 to 9:15, [Petitioner] is alone. That is a Type 4[sic] delay. Between 9:15.50 and 9:31, this is more questioning about the gun, a mixture of Type 4, but more of a Type 2 because there is an effort to find out where the gun is at. That period was 16 minutes.

Between 9:28.30 and 12.30.47, the Court deems that to be Type 1 ... is one that can have no effect on the voluntariness of a statement and is, therefore, immaterial to the suppression. The statement had been given by then and there was no effort to obtain a statement during that period of time.

In addition to weighing the delay, the circuit court considered that [Petitioner] was sixteen years old, in the ninth grade, able to speak the English language and displayed rational thought processes. Although not experienced with the adult criminal justice system, [Petitioner] had prior contact with the system as a juvenile "sufficient to have been read his *Miranda* Rights." The court found that he was not under the influence of alcohol or drugs and that the detectives "carefully avoided making any promise" to [Petitioner] during their interactions. The court further pointed out that [Petitioner] "challenged the officers as to the

nature of any incriminating evidence against him and offered numerous denials...." In addition, the court determined that [Petitioner] demonstrated that he was alert and "out and about" after 1:00 a.m. when he was arrested and, although he communicated that he was tired at approximately 6:47 a.m., he "remained sharp of wit or [sic] alertness, including discerning efforts of Detective Turner to perhaps put words in his mouth."

The court acknowledged that [Petitioner] made several requests to place a telephone call to his mother and that, initially, the requests were denied, concluding that it "was reasonable for police to delay any contact until the search warrant was executed ..." because [Petitioner] indicated during the interviews that his mother was at home. When given the opportunity to call his mother, the court observed, [Petitioner] called his girlfriend. Finally, the court observed that [Petitioner] was permitted bathroom breaks, food and drink whenever they were requested although perhaps "not as many opportunities ... as one might have preferred."

Ultimately, the court concluded:

The Court notes that the total time of actual interrogation was 4 hours and 21 minutes. We go through what I went through. Twenty-seven of those minutes related to Detective's [sic] Harding's—Sergeant Harding's questioning about the whereabouts of the gun.

Weighing the various factors, acknowledging that the Court has effectively found that the Defendant was being held by the police specifically to get a statement, looking at the totality of the circumstances, the Court finds that the statements made were voluntarily made and the motion to suppress the statement is denied.

194 Md.App. at 335–342, 4 A.3d. at 101–105. (Emphasis supplied, footnotes omitted).

The Court of Special Appeals noted that "the trial court employed the categories of delay that [the intermediate appellate court] previously delineated in *Odum* [*v. State*], 156 Md.App. [184] at 202–04, 846 A.2d [445] at 445 [ (2004) ], upon

a review of the trilogy of prompt presentment cases decided by the Court of Appeals in 2003: *Williams v. State,* 375 Md. 404, 825 A.2d 1078 (2003); *Facon v. State,* 375 Md. 435, 825 A.2d 1096 (2003); and *Hiligh v. State,* 375 Md. 456, 825 A.2d 1108 (2003)." *Id.* at 344, 4 A.3d at 106. After discussing the *"Williams* trilogy," the Court of Special Appeals explained why what occurred between 2:00 a.m. and 8:05 a.m. was relevant to its voluntariness analysis, as well as why there is no merit in the State's argument that the police needed this period of time to obtain a search warrant for Petitioner's residence:

> [Petitioner] was arrested pursuant to an outstanding warrant shortly after 1:00 a.m. on March 21, 2007, having already been charged with first-degree murder and related charges arising out of the shooting on Daimler Drive. [Petitioner] was placed in the interview room at approximately 2:00 a.m. Although he was not taken before a Commissioner until approximately twelve and one-half hours following his arrest, he provided the inculpatory statements at 8:05 a.m., according to Detective Turner's testimony. Any subsequent delay is not relevant to our voluntariness analysis.
>
> We reject the State's contention that the seven and one-half hour delay from 2:00 a.m. until the time that the search warrant was signed at approximately 8:30 a.m. was necessary to acquire a search warrant for [Petitioner]'s home. The trial court correctly observed that the police had sufficient information for the search warrant prior to [Petitioner]'s interview and, in fact, gained no additional substantive information during their interviews with [Petitioner] to assist in their efforts to acquire the search warrant.

*Id.* at 350–51, 4 A.3d at 110.

The Court of Special Appeals concluded that one hour, "at most," was a "necessary delay" for administrative procedures, and expressly held that "[f]rom approximately 3:00 a.m. until 8:05 a.m., [Petitioner] was deliberately detained for the purpose of obtaining a confession." *Id.* at 351–52, 4 A.3d at 111. Despite this period of deliberate detention, the Court of Special Appeals stated:

According heavy weight to the five hours of unnecessary delay in this case, we nonetheless hold that [Petitioner]'s confession was voluntary under the totality of the circumstances. Our review of the suppression hearing testimony and the transcript of the interviews confirms that, although sixteen years old, [Petitioner] had previously been charged with a juvenile offense and had been read his *Miranda* rights. [Petitioner] was advised of those rights, indicated that he understood them and does not challenge the voluntariness of his *Miranda* waiver.

*Id.* at 352, 4 A.3d at 111.

After acknowledging that, before Petitioner made his inculpatory statements, he had made thirteen requests to be allowed to call his mother, the Court of Special Appeals noted that "the fact that a juvenile's waiver is without the guidance and advice from a parent does not, *ipso facto,* render the juvenile's pretrial statement involuntary." *Id.* at 353, 4 A.3d at 112. After quoting from this Court's opinions in *McIntyre v. State,* 309 Md. 607, 526 A.2d 30 (1987) and *Jones v. State,* 311 Md. 398, 535 A.2d 471 (1988), the Court of Special Appeals ultimately concluded:

In the final analysis, Maryland law currently recognizes that lack of parental involvement is but one factor to be considered in a totality of the circumstances analysis. . . .

In sum, we agree with the trial court that the delay in permitting [Petitioner] to call his mother was permissible under the circumstances, as the efforts to obtain and execute a search warrant for her home were ongoing. Despite the unnecessary and deliberate delay in this case, we are persuaded that the delay did not render the confession involuntary. Under the totality of the circumstances, [Petitioner] knowingly and voluntarily confessed.

*Id.* at 327, 4 A.3d at 114.

### Discussion

The following standard of review is applicable to the case at bar:

" '[W]e view the evidence and inferences that may be reasonably drawn therefrom in a light most favorable to the prevailing party on the motion,' " here, the State. *Owens v. State,* 399 Md. 388, 403, 924 A.2d 1072, 1080 (2007) (*quoting State v. Rucker,* 374 Md. 199, 207, 821 A.2d 439, 444 (2003)), cert. denied, 552 U.S. 1144, 128 S.Ct. 1064, 169 L.Ed.2d 813 (2008). "We defer to the motions court's factual findings and uphold them unless they are shown to be clearly erroneous." *State v. Luckett,* 413 Md. 360, 375 n. 3, 993 A.2d 25, 33 n. 3 (2010). "We, however, make our own independent constitutional appraisal, by reviewing the relevant law and applying it to the facts and circumstances of this case." *Id.,* 993 A.2d at 33 n. 3. (quotation marks and citation omitted). *Lee v. State,* 418 Md. 136, 148–49, 12 A.3d 1238, 1245–46 (2011).

*Robinson v. State,* 419 Md. 602, 611–612, 19 A.3d 952, 957 (2011).

In *Winder v. State,* 362 Md. 275, 765 A.2d 97 (2001), this Court stated:

> The trial court's determination regarding whether a confession was made voluntarily is a mixed question of law and fact. See *Baynor v. State,* 355 Md. 726, 729 n. 1, 736 A.2d 325, 326 n. 1 (1999); *Hof* [*v. State*], 337 Md. [581] at 605, 655 A.2d [370] at 382 [ (1995) ]; *Hillard* [*v. State*], 286 Md. [145] at 151, 406 A.2d [415] at 419 [ (1979) ]. As such, we undertake a *de novo* review of the trial judge's ultimate determination on the issue of voluntariness. Our review of the Circuit Court's denial of Appellant's motion to suppress is limited to the record of the suppression hearing. See *Cartnail v. State,* 359 Md. 272, 282, 753 A.2d 519, 524 (2000).

*Id.* at 310–11, 765 A.2d at 116.

█ It is clear that the "totality of the circumstances" test is applied when determining the voluntariness of a juvenile's confession. *Jones v. State,* 311 Md. 398, 407, 535 A.2d 471, 476 (1988).

The record includes the APPLICATION FOR STATEMENT OF CHARGES that Detective Turner presented to a

District Court Commissioner on March 20, 2007 at 1:20 p.m. The following assertions are included in that Application:

During the course of the follow-up investigation, two witnesses to this homicide were located and interview[ed] by Homicide Investigators. The first witness stated that [Petitioner], and several other young black males were hanging out in the apartment complex located on Cindy Lane. He stated that he observed [Petitioner] armed with a black 9mm semi-automatic handgun. (Three 9mm shell casings were recovered from the crime scene) this witness further stated that he heard several gunshots and then observed [Petitioner] and two other subjects running back from the area of the Daimler Drive where the decedent was found. After the shooting, this witness stated [that] he overheard a conversation between the two subjects that were with the above defendant at the time of the shooting. These subjects stated that the above defendant shot the victim during an attempted robbery. Additionally, a second witness was located and interviews by Homicide Detectives. This witness stated that he was also with the above defendant and several other subjects hanging out in the apartment complex on Cindy Lane. This witness stated that he observed the above defendant and two other subjects cross Central Avenue and begin to follow the decedent and his two friends. He also observed [Petitioner] armed with a handgun. This witness stated that he observed the decedent and his friends begin to run. At that point, this witness heard several gunshots and saw muzzle flash from the weapon. This witness then observed [Petitioner] and two others run away from the shooting scene. He observed [Petitioner] state he was going to "get their money" prior to the shooting. Both witnesses know [Petitioner] personally. All of these events occurred in Prince George's County, Maryland.

The Application does not include the date or dates on which the two witnesses made their statements to the investigators. As the Circuit Court pointed out, however, the information supplied by the two witnesses established probable cause for

the issuance of a search warrant. Under these circumstances, we agree with the Circuit Court and the Court of Special Appeals that "heavy weight" must be given to the fact that Petitioner's inculpatory statement was not made until he had been subjected to a deliberate and unnecessary delay in bringing him before a judicial officer.

The record also includes the ARREST WARRANT ON CHARGING DOCUMENT issued by the District Court at 1:30 p.m. on March 20, 2007. The following mandate appears on the face of Petitioner's arrest warrant:

> TO ANY PEACE OFFICER, Greetings:
>
> YOU ARE ORDERED to arrest and bring before a judicial officer the above-named Defendant as soon as practicable and without unnecessary delay. If a judicial officer is not readily available, this Warrant shall authorize the prisoner's detention until compliance is had with Rule 4–212 and the arresting officer is authorized and required to comply with Rule 4–212.

During Detective Turner's suppression hearing testimony, the following transpired when he was cross-examined about why he decided to subject Petitioner to further interrogation:

Q When you first got there at 3:20, Detective Cordero had already attempted to interrogate Mr. Moore in reference to the crime; isn't that correct?

A He had contact with the Defendant prior to me going in. Yes.

Q Well, he asked him questions about the crime and whether he was involved and all of that, didn't he?

A I know that he explained the charges and I know that he showed him some photographs of witnesses and co-defendants.

Q Why when you arrived, did you not take him before the commissioner?

\* \* \*

A Because I wanted the opportunity to speak to him and explain the charges, get his side of the story. We planned on doing a search warrant.

Q Well, sir, why would you want—need his side of the story if you already had an arrest warrant for him and you could have taken him before the commissioner at that time, couldn't you?

A Well, I wanted his side of the story to corroborate with what the witnesses said in the application of charges to verify—

* * *

Q You wanted to interrogate him; is that correct?

A I wanted to talk to him and verify that I had the right suspect.

Q You didn't verify that before you made application and got a warrant for first degree murder?

* * *

A As I said, I interviewed the other two witnesses. They provided information. The warrant is based on that information. He was arrested and I wanted to verify what they said and get his side of the story about how it occurred.

■ In making our constitutionally independent evaluation of the "totality of the circumstances," we must combine (1) the "heavy weight" assigned to the deliberate and unreasonable delay to which Petitioner was subjected *after* he denied that he had participated in the crime, (2) the "crucial factor" of Petitioner's age, and (3) the "very important" factor that Petitioner requested to speak with his mother.

In *Jones, supra,* while holding that a seventeen year old murder defendant was not entitled to suppression of a confession that he made one hour after he had been advised of his *Miranda* rights, this Court stated:

We recognize, of course, that great care must be taken to assure that statements made to the police by juveniles are voluntary before being permitted in evidence. *McIntyre v.*

*State,* 309 Md. 607, 617, 526 A.2d 30[, 41] (1987).... The absence of a parent or guardian at the juvenile's interrogation is an important factor in determining voluntariness, although the lack of access to parents prior to interrogation does not automatically make a juvenile's statement inadmissible. *Id.*

311 Md. at 407, 535 A.2d at 476.

 In *McIntyre,* while holding that a fifteen year old rape defendant was not entitled to the suppression of a confession that he made fifty five minutes after he had been advised of his *Miranda* rights, this Court emphasized four points that are of consequence to the case at bar. First, the United States Supreme Court has held that "youth" is "a crucial factor in determining, in the totality of the circumstances, whether the [juvenile defendant's] confession was voluntary under the due process clause of the Fourteenth Amendment." 309 Md. at 618, 526 A.2d at 35. Second, quoting from *Miller v. State,* 251 Md. 362, 378–79, 247 A.2d 530, 539 (1968), this Court noted that "the [United States] Supreme Court 'has emphasized that admissions of juveniles require special caution.' " *Id.* Third, although a juvenile's request to see a parent does not constitute an invocation of the right to remain silent, "[t]hat a denial of parental access to a juvenile charged as an adult with a crime is a factor, *and a very important one,* in applying the totality of the circumstances test is entirely clear." 309 Md. at 625, 526 A.2d at 38 (emphasis in original). Fourth, "[a]lso to be factored into the totality test is [whether the juvenile defendant's] statement was exculpatory and was given shortly after his [or her] arrival at the police station[.]" 309 Md. at 626, 526 A.2d at 39.

The case at bar does not involve the admissibility of an inculpatory statement made by Petitioner shortly after Detective Turner began his interrogation. The fact is that Petitioner did not make any inculpatory statement until almost three hours after he had "give[en] his side of the story" to Detective Turner. As noted by the Court of Special Appeals, as of 5:18 a.m., Petitioner had repeatedly proclaimed his innocence. The

record clearly shows that Petitioner did not make an inculpatory statement until long after he should have been brought before a judicial officer. Under these circumstances, the Circuit Court erred in determining that Petitioner's inculpatory statement was voluntary.

For the reasons stated above, we hold that Petitioner is entitled to a new trial during which direct and/or derivative evidence of the inculpatory statements made during his post-arrest custodial interrogation will be inadmissible during the State's case-in-chief, as well as during the State's case in rebuttal.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED; CASE REMANDED TO THAT COURT WITH DIRECTIONS TO REMAND TO THE CIRCUIT COURT OF PRINCE GEORGE'S COUNTY FOR A NEW TRIAL; COSTS IN THIS COURT AND THE COURT OF SPECIAL APPEALS TO BE PAID BY PRINCE GEORGE'S COUNTY.**